UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

ARI BARUCH TEMAN,

Plaintiff,

—against—

MEDPRO GROUP INC.;

    ATTORNEY PROTECTIVE;

    SCOTT PATRICK;

LEWIS BRISBOIS BISGAARD & SMITH LLP;

    CRISTINA YANNUCCI;

    SAM COHEN;

ZELDES NEEDLE COOPER LLP;

    ROBERT S. COOPER;

    MAXIMINO MEDINA;

    JEREMY VIRGIL;

DANAHER LAGNESE, P.C.;

SILVER HILL HOSPITAL, INC.,

Defendants.

-----------------------------------------------------------------X

Civil Action No. _____

**COMPLAINT AND JURY DEMAND**

Plaintiff Ari Baruch Teman ("Plaintiff" or "Teman"), appearing pro se, alleges as follows:

## I. NATURE OF THE ACTION

1. This action arises from a coordinated course of conduct by Plaintiff's former counsel, opposing counsel, and malpractice insurers to:

    (a) coerce Plaintiff into an unjust and substantially undervalued settlement;

1

(b) suppress material claims, including claims of sexual misconduct supported by documentary evidence; and

(c) unlawfully withhold Plaintiff's client file to prevent him from pursuing legal remedies.

2. The scheme was motivated by shared financial incentives to minimize malpractice exposure and avoid significant insurance payouts.

3. Defendants' ongoing refusal to produce Plaintiff's client file—property to which Plaintiff has a presumptive legal right—constitutes a continuing wrongful act central to this action.

---

## II. JURISDICTION AND VENUE

### A. Federal Question Jurisdiction

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims under RICO, 18 U.S.C. § 1961 et seq.

### B. Diversity Jurisdiction

5. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332.
6. Plaintiff is a citizen of Florida, residing in Miami Beach.
7. Defendants are citizens of New York and Connecticut.
8. The amount in controversy exceeds $75,000.

### C. Supplemental Jurisdiction

9. The Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

### D. Venue

10. Venue is proper under 28 U.S.C. § 1391.
11. The conversion and withholding of Plaintiff's client file occurred in this District in connection with litigation before this Court (*Teman v Zeldes (1:24-cv-09830; SDNY))*.

---

## III. PARTIES

6. Plaintiff Ari Baruch Teman is an individual, United States Citizen, and a resident of Miami Beach, Florida and Tel Aviv, Israel.

7. Defendant Zeldes Needle Cooper LLP ("ZNC") is a law firm that represented Plaintiff, which practices in this district.

8. Defendant Jeremy Virgil is a partner at ZNC, practices in this district, and was lead counsel for Plaintiff. He resides and also works in Connecticut.

9. Defendant Maximino Medina was a senior attorney and/or managing partner involved in Plaintiff's representation, and practiced in this district, and resides and also works in Connecticut.

10. Defendant Robert S. Cooper is a partner at ZNC involved in the firm's operations and practices relevant to this action, and practices in this district, and resides and also works in Connecticut.

11. Defendant Lewis Brisbois Bisgaard & Smith LLP is counsel to ZNC and its attorneys in related litigation.

12. Defendant Cristina Yannucci is a partner at Lewis Brisbois and counsel of record in *Teman v. Zeldes*. She practices in this district.

13. Defendant Sam Cohen is an attorney at Lewis Brisbois involved in the same representation. He practices in this district.

14. Defendant Attorney Protective is a professional liability insurer for ZNC, and a division of MedPro.

15. Defendant MedPro Group Inc. is a malpractice insurer and/or reinsurer involved in coverage and claims handling.

16. Defendant Scott Patrick is the President of Attorney Protective, a division of MedPro and was personally involved in communications concerning Plaintiff's file and claims.

17. Defendant Danaher Lagnese, P.C. is counsel for Silver Hill Hospital in the underlying matter.

18. Defendant Silver Hill Hospital, Inc. is a healthcare institution involved in Plaintiff's underlying claims.

## IV. FACTUAL ALLEGATIONS

### A. The Underlying Representation

12. Plaintiff retained ZNC to prosecute a medical malpractice action involving substantial damages.

13. The case included claims of serious misconduct, including sexual misconduct by Dr. Irwin Gelman, supported by hospital records and deposition testimony.

### B. Coercive Settlement (Heightened Specificity)

14. In or about 2016, Defendants Virgil and Medina exerted extreme and improper pressure on Plaintiff to settle.

15. Specifically, Virgil and Medina:
(a) physically retained Plaintiff in their offices;
(b) transported Plaintiff and controlled his movements;
(c) refused to allow Plaintiff to return home or obtain rest;
(d) forced Plaintiff to lie on the floor in Virgil's office;
(e) deprived Plaintiff of sleep for an extended period, despite knowledge of Plaintiff's medical condition and recent surgery; and
(f) threatened withdrawal of representation immediately before a critical court proceeding.

16. These actions rendered Plaintiff physically and mentally compromised.

17. These events are corroborated by contemporaneous communications, medical records, and the timing and circumstances of the settlement, which will be produced in discovery.

18. Defense counsel for Silver Hill, including Danaher Lagnese, were aware of the circumstances surrounding the settlement negotiations.

19. Under these conditions, Plaintiff was coerced into executing a settlement for approximately $80,000.

20. The settlement removed material allegations, including claims of sexual misconduct.

21. The accusation, if not removed under settlement, would have required Silver Hill to conduct Mandatory Reporting.

---

**C. Participation of Danaher Lagnese**

22. Danaher Lagnese participated in settlement negotiations on behalf of Silver Hill.

23. At the time, Defendants were aware that Plaintiff intended to proceed to trial.

24. The settlement materially reduced Silver Hill's exposure, and eliminated the need for "mandatory reporting".

---

**D. Plaintiff's Client File (Core Conduct)**

25. Plaintiff repeatedly demanded his client file.

26. Under New York law, a client has a presumptive right to the entire file.
*Sage Realty Corp. v. Proskauer Rose*, 91 N.Y.2d 30 (1997).

27. This Court has recognized that such a presumptive right exists and that Plaintiff may pursue recovery of the file through an appropriate proceeding.

28. Despite this, Defendants refused to produce the file.

5

**E. Unlawful Conditions**

29. Defendants demanded:

   (a) identification of specific documents; and

   (b) payment as a condition of access.

30. These conditions are inconsistent with governing law and constitute wrongful interference with Plaintiff's property rights.

**F. Insurer Involvement (Personal Participation)**

31. Attorney Protective and MedPro were copied on Plaintiff's demands.

32. Defendant Scott Patrick personally:
   (a) received and reviewed communications;
   (b) forwarded those communications; and
   (c) participated in decisions concerning the withholding of Plaintiff's file.

33. Upon information and belief, Patrick directed or approved continued refusal to produce the file, and directed the funding of such activity despite being informed it was against the law and being notified of Judge Liman's most-recent order.

**G. Discovery of the Scheme / Tolling**

34. Plaintiff did not discover the full extent of Defendants' conduct until 2024–2026.

35. The scheme was concealed through:
   (a) misrepresentations regarding insurance coverage;
   (b) withholding of the client file;

(c) misleading statements by counsel.

36. The ongoing refusal to produce the file constitutes a continuing wrong.

---

**H. Structural Insurance Incentives and Claims Suppression**

37. Defendant MedPro Group Inc., together with its affiliated entities including Attorney Protective, provides professional liability insurance coverage to both (i) healthcare providers facing medical malpractice claims and (ii) attorneys and law firms involved in prosecuting or defending such claims.

38. This dual-layer coverage creates a vertically integrated structure in which the same insurance enterprise bears financial exposure arising from both underlying medical malpractice liability and derivative legal malpractice risk.

39. As a result, Defendants possess a direct financial incentive to minimize aggregate payouts across both categories of risk.

40. This structure creates a "closed-loop" system in which increased payouts in medical malpractice cases may give rise to increased exposure for legal malpractice claims, and vice versa, thereby incentivizing coordinated suppression of claim values.

41. Upon information and belief, Defendants utilize this structure to influence litigation strategy, settlement positioning, and claims handling practices across insured parties, including through communications with counsel and funding of defense efforts.

42. This coordinated incentive structure distorts the valuation of malpractice claims by prioritizing enterprise-wide financial outcomes over claim-specific merits.

43. The effect of this structure is to suppress the market value of malpractice claims, discourage full litigation of high-value cases, and interfere with the provision of independent, conflict-free legal representation.

44. In Plaintiff's case, these incentives manifested in coercive settlement conduct, suppression of material claims, and actions designed to prevent Plaintiff from accessing information necessary to evaluate and pursue his rights.

45. But for these structural financial incentives, Plaintiff would have proceeded to trial or obtained a materially higher settlement reflecting the full value of his claims.

## V. CLAIMS FOR RELIEF

## COUNT I — RICO (18 U.S.C. § 1962(c))

46. Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

47. Defendants constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4), namely an association-in-fact comprised of:

- Zeldes Needle Cooper LLP and its attorneys,
- Lewis Brisbois and its attorneys,
- Attorney Protective and MedPro,
- and affiliated individuals including Scott Patrick.

48. The enterprise had a common purpose:

   **to minimize malpractice liability exposure and financial payouts by suppressing claims, coercing settlements, and controlling access to client information.**

49. The enterprise functioned as a continuing unit, with relationships among its members, including:

- insurer oversight and funding,
- coordinated litigation strategy,
- shared communications regarding Plaintiff's claims and file.

50. Defendants conducted and participated in the conduct of the enterprise's affairs through a **pattern of racketeering activity**, including multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

---

### Predicate Acts — Wire Fraud

51. To state wire fraud, Plaintiff must allege "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires in furtherance of the scheme."

52. See **Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106, 119 (2d Cir. 2013)**.

53. Defendants devised a scheme to defraud Plaintiff of:

- his property interest in his client file,
- the full value of his legal claims,

8

- and his ability to pursue those claims.

54. In furtherance of that scheme, Defendants transmitted interstate electronic communications, including emails:

a. falsely representing that Plaintiff was required to identify specific documents and pay fees to obtain his own client file; For example, on or about April 23, 2026, Defendant Cristina Yannucci transmitted an email to Plaintiff stating that Plaintiff was required to identify specific documents and pay fees to obtain his own client file. This statement was materially false under controlling New York law and was made to delay and obstruct Plaintiff's recovery of his property.

b. For example, on or about Feb 16, 2026, Defendants transmitted communications representing that a declaration page constituted the complete insurance policy, when in fact material policy terms and coverage details were omitted, further misleading Plaintiff as to the scope of available coverage.

Upon information and belief, these communications were coordinated among Defendants, including insurer Defendants and counsel, as part of a unified strategy to delay production of the client file and suppress Plaintiff's claims.

c. Similar communications were transmitted on multiple occasions by Defendants Zeldes and Virgil, including but not limited to May 2022, May 2024, and thereafter, each furthering the scheme described herein.

d. falsely representing or implying that a declaration page constituted a complete insurance policy;

e. making materially misleading statements regarding the scope and status of document production.

55. These statements were materially false and misleading because, under New York law, a client presumptively owns the entire client file.

56. These statements were not mere legal disagreements but were knowingly false and made with the intent to mislead Plaintiff and delay his recovery of his client file in order to conceal malpractice and reduce Defendants' financial exposure.

**Client File Rights**

9

57. New York law is clear that, absent narrow exceptions, a client is entitled to the full client file.

58. See **Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP, 91 N.Y.2d 30, 34–35 (1997)**.

59. Defendants' demands for payment and document-by-document identification were inconsistent with this established right and were designed to obstruct Plaintiff's access to his property.

**Extortionate Conduct (RICO Predicate Context)**

60. Defendants conditioned access to Plaintiff's own property on payment of money and compliance with unlawful demands.

61. Such conduct constitutes the wrongful use of economic pressure to obtain property and further evidences the fraudulent scheme.

**Continuity**

62. Defendants' conduct demonstrates both closed-ended and open-ended continuity:

- beginning with coercive settlement conduct in or about 2016, and

63. continuing through Defendants' ongoing refusal to produce Plaintiff's file.

64. The pattern of racketeering continued through Defendants' recent refusals to produce the file.

65. The last predicate act occurred within the limitations period.

66. *See* **H.J. Inc. v.** Northwestern **Bell Tel. Co., 492 U.S. 229, 239–42 (1989)** (pattern requires continuity and relationship).

**Injury**

67. Plaintiff suffered injury to his business and property, including:

○ loss of the value of his legal claims,

○ deprivation of his client file,

○ and costs incurred in attempting to recover his property and rights.

**COUNT II - RICO CONSPIRACY (18 U.S.C. § 1962(d))**

68. Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

69. Defendants knowingly agreed to participate in the conduct of the enterprise's affairs through the pattern of racketeering activity described above.

70. Each Defendant knew the essential nature of the scheme and agreed to facilitate it.

71. See **Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244–45 (2d Cir. 1999)**.

---

## COUNT III - CONVERSION (CLIENT FILE)

72. Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

73. Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another."

   *See* **Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y.3d 43, 49–50 (2006)**.

74. Plaintiff has a possessory right to his client file.

75. Defendants exercised unauthorized dominion over that file by:

- refusing to produce it,
- conditioning its release on unlawful demands.

76. Defendants' conduct is ongoing.

77. Specific Harm: Defendants' ongoing conversion of the client file has caused, and continues to cause, irreparable harm by preventing Plaintiff from filing a fulsome Second Amended Complaint in Teman v. Zeldes (SDNY) and preventing Plaintiff from adequately answering discovery in related matters.

78. Upon information and belief, Defendants are withholding the file specifically to suppress evidence that they made material misrepresentations to the Court (Judge Liman) regarding the file's contents and the scope of prior productions, and to prevent discovery of additional misconduct and malpractice by Zeldes and co-defendants.

---

## COUNT IV - REPLEVIN

11

79. Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

80. Replevin lies where a plaintiff seeks the return of specific property wrongfully withheld.

81. Plaintiff is entitled to immediate possession of his client file.

---

## COUNT V - FRAUD (Rule 9(b))

82. Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

83. To plead fraud, Plaintiff must allege:

- a material misrepresentation,
- knowledge of falsity,
- reliance,
- Damages.

84. See **Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006)**.

85. Defendants, including Yannucci and Cohen, made specific statements that:

- the declaration page constituted the policy,
- Plaintiff must identify documents and pay for his file.

86. These statements were false when made and known to be false.

87. Plaintiff detrimentally relied on these misrepresentations by attempting to resolve the file production through good-faith meet-and-confers and administrative follow-ups rather than immediate judicial intervention. This reliance resulted in weeks of unnecessary litigation, the loss of billable work time, and the forced expenditure of labor to draft a Motion to Compel for materials Defendants had already agreed to provide.

---

## COUNT VI - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

88. Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

89. ZNC owed Plaintiff fiduciary duties.

90. Insurer Defendants and Lewis Brisbois knowingly induced and substantially assisted breaches of those duties.

12

91. See Kaufman **v. Cohen, 307 A.D.2d 113, 125–26 (1st Dep't 2003)**.

---

## COUNT VII -LEGAL MALPRACTICE

92. Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

93. To state malpractice, Plaintiff must allege:

- negligence,
- proximate cause,
- actual damages.

94. See **Rudolf v**. Shayne, Dachs, Stanisci, Corker & Sauer, 8 N.Y.3d 438, 442 (2007).

95. ZNC breached its duties by:

- coercing settlement,
- failing to pursue viable claims,
- acting under conflicts.

96. Defendants' conduct is subject to equitable tolling due to concealment.

97. Defendants' legal malpractice covers multiple incidents, in multiple years, in multiple jurisdictions. The following non-exhaustive categories illustrate Defendants' breaches:

a. **Theme A: Coercion & Ethical Breaches (Points 1 & 10)**

    i. **The Floor/Settlement:**
   Forcing a client to sleep on an office floor to obtain a settlement is a breach of the fiduciary duty of loyalty and the duty to provide competent representation.

    ii. **Mandatory Reporting**
   The failure to report Dr. Gelman to required entities allowed the defendants to "quietly" settle the case at a lower value to avoid institutional scrutiny, which harmed Plaintiff's position, and likely endangered other victims and potential victims of Gelman.

    iii. Failure to report Dr. Gelman was used as "leverage" by the the Defendants to keep the settlement low, which ZNC prioritized over Plaintiff's interest.

b. **Theme B: Strategic and Procedural Failures (Points 6, 7, 8, & 9)**

i. **Failure to Merge/Federalize:**

But for the failure to move these cases to the SDNY, Plaintiff was forced to litigate in a forum with conflicted judges and counsel, including judges in CT who disclosed personal conflicts with Silver Hill, and with professional and membership organizations that put counsel and the local court in conflict with the best interest of the Plaintiff in the interest of justice, which directly led to the undervalued settlement. To wit, one of the judges was on the board of Silver Hill and Defendants Virgil, Preuher, Medina, Cohen, and Zeldes Needle failed to motion to recuse.

ii. The failure of Preuher to memorialize and alert Teman to the conflicted and inadequate representation by Zeldes, Virgil, and ZNC after Preuher's relationship with Zeldes ended, despite him admitting to following the dockets, and to connecting himself to Teman on Social Media, constitutes a breach of the attorney's ongoing duty to the client after the representation ends, and a breach of Preuher's duties as an officer of the court and a witness to ongoing fraud against a client. Preuher did this in exchange for personal financial and reputational gain and as a result Teman was harmed and continues to suffer harm.

iii. As a result of the failure to serve these defendants, Plaintiff's claims against them were barred or significantly devalued, resulting in approximately $24,000,000 in damages.

iv. **Service Failures and Failure to Amend:**

The failure to properly serve and issue claims against Dr. Reddy, Darya Braverman, and "Total Health Nutrients" caused the loss of viable claims and delayed your recovery.

c. **Theme C: Withholding of the Client File (Points 2, 3, 4, & 5)**

i. The refusal to provide files for:

1. *Silver Hill*
2. *Braverman/PATH*,
3. *Buch*,
4. and *US v. Teman*

constitutes a breach of the attorney's ongoing duty to the client after the representation ends.

14

98. **ZNC** breached **its duties of care, skill, and diligence by, among other things: * a.** Coercing **Plaintiff** into a settlement while he was in a compromised state, including physically restraining him in an office and forcing him to sleep on the floor.

- **b.** Failing to advise Plaintiff to consolidate the *Silver Hill* and *Braverman* actions into a single federal action in the SDNY to avoid local conflicts and maximize efficiency.

- **c.** Failing to effectuate proper service of process on key defendants, including Dr. Anupama Reddy and Darya Braverman. * **d.** Failing to perform mandatory reporting requirements regarding the sexual misconduct of Dr. Irwin Gelman. * **e.** Repeatedly and systematically refusing to produce the entirety of Plaintiff's client files across multiple matters (including *Silver Hill*, *Braverman*, *Buch*, and *US v. Teman*).

99. See **Zumpano v. Quinn, 6 N.Y.3d 666 (2006)** (equitable estoppel where wrongdoing concealed claim).

100. Plaintiff suffered substantial damages.

---

## COUNT VIII - TORTIOUS INTERFERENCE

101. Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

102. Defendants interfered with Plaintiff's ability to pursue claims and obtain testimony, including through actions relating to a key witness.

---

## COUNT IX - UNJUST ENRICHMENT

103. Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

104. Defendants were enriched at Plaintiff's expense through fees and avoided liability.

105. See **Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (2011)**.

---

**COUNT X - INJUNCTIVE RELIEF**

106.   Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

107.   Plaintiff seeks immediate production of his client file.

**COUNT XI — SHERMAN ACT § 2 - MONOPOLIZATION / ATTEMPTED MONOPOLIZATION**
*(15 U.S.C. § 2 — Sherman Act)*

108.   Plaintiff repeats and realleges the foregoing allegations and incorporates them herein for the purpose of establishing each element of this cause of action.

**Relevant Market**

109.   The relevant market is the market for professional liability insurance and malpractice claims resolution in medical malpractice litigation within the United States, and alternatively within the State of New York (the "Relevant Market").

**Market Power**

110.   Defendant MedPro Group Inc., together with affiliated entities including Attorney Protective, possesses substantial market power in the Relevant Market by virtue of its provision of insurance coverage to both healthcare providers and legal professionals involved in malpractice litigation. Upon information and belief, MedPro is among the leading providers of healthcare liability insurance in the United States and maintains significant coverage relationships with both healthcare providers and law firms engaged in malpractice litigation.

16

111.   This includes coverage of both underlying medical malpractice liability and derivative legal malpractice exposure arising from the same claims, giving Defendants a uniquely integrated position not shared by typical market participants.

---

**Anticompetitive Conduct**

112.   Defendants have willfully acquired and maintained their market power through exclusionary and anticompetitive conduct, including:

(a) structuring insurance coverage in a manner that internalizes liability across both sides of malpractice risk;

(b) creating financial incentives to suppress the value of malpractice claims irrespective of their merits;

(c) influencing litigation strategy and settlement practices across insured parties in order to minimize aggregate payouts;

(d) interfering with independent legal representation by introducing undisclosed financial conflicts arising from shared insurance coverage; and

(e) discouraging full litigation of claims that would expose the true market value of malpractice liability.

(f) reducing output by discouraging the full litigation and adjudication of high-value malpractice claims.

(g) aligning financial incentives across nominally adverse parties in a manner that replaces independent market-based claim valuation with coordinated outcome suppression.

**Harm to Competition**

113. Defendants' conduct harms competition in the Relevant Market by:

(a) distorting the pricing and valuation of malpractice claims;

(b) suppressing settlement values below competitive levels;

(c) disadvantaging plaintiffs and law firms that seek to litigate claims independently of insurer influence; and

(d) impairing the ability of competing insurers and legal service providers to operate in a market governed by fair and independent claim valuation.

(e) reducing quality by impairing the availability of independent, conflict-free legal representation in malpractice litigation.

**Antitrust Injury**

114. Plaintiff suffered antitrust injury of the type the Sherman Act was designed to prevent, in that his claims were suppressed and undervalued as a direct result of Defendants' anticompetitive conduct, reflecting broader market-wide distortion rather than isolated misconduct.

115. Plaintiff's injury flows directly from Defendants' suppression of competition in the Relevant Market, including the reduction of claim values and interference with conflict-free legal representation.

116. **Specific Injury to Plaintiff**

117.    In Plaintiff's case, Defendants' conduct resulted in coercive settlement practices, suppression of material claims, and the deprivation of the full value of Plaintiff's legal claims.

118.    But for Defendants' anticompetitive conduct, Plaintiff would have proceeded to trial or obtained a materially higher settlement consistent with competitive market conditions.

**Attempted Monopolization (Alternative)**

119.    In the alternative, Defendants have engaged in attempted monopolization by:

(a) engaging in anticompetitive conduct as described above;

(b) with a specific intent to control or distort the Relevant Market; and

(c) with a dangerous probability of achieving monopoly power in that market due to their integrated insurance structure.

**Damages**

120.    As a direct and proximate result of Defendants' violations of Section 2 of the Sherman Act, Plaintiff has suffered damages in an amount to be determined at trial, including but not limited to the loss of the full value of his legal claims.

**VII. PRAYER FOR RELIEF**

**WHEREFORE, Plaintiff respectfully demands judgment against Defendants as follows:**

a. Compensatory damages in an amount to be determined at trial, but believed to exceed $24,000,000;

b. Treble damages pursuant to 18 U.S.C. § 1964(c);

c. Punitive damages to the fullest extent permitted by law;

d. Equitable tolling of all applicable statutes of limitation;

e. Injunctive relief compelling immediate production of Plaintiff's complete client file;

f. Costs of suit, including reasonable fees where permitted by law;

g. A declaration that Defendants' conduct violates Section 2 of the Sherman Act;

h. Injunctive relief prohibiting Defendants, as to Plaintiff and substantially related matters, from engaging in representations or claims-handling practices where their professional judgment is materially limited by financial interests arising from shared professional liability insurance coverage;

i. Injunctive relief restoring competitive conditions in the Relevant Market and preventing continued suppression of malpractice claim values;

j. Structural injunctive relief requiring Defendants, including MedPro Group Inc. and Attorney Protective (and any parent or affiliate including Berkshire Hathaway Inc.), to implement separation between (i) medical malpractice insurance operations and (ii) legal malpractice insurance operations, including:

> (i) independent underwriting and claims-handling teams for each line;
> (ii) information firewalls prohibiting the sharing of claim-specific information where the same underlying events are implicated;
> (iii) prohibition on coordinated settlement decision-making across those lines in the same or related matters; and
> (iv) mandatory written disclosure to insureds and affected claimants of any overlapping financial exposure;
> (v) prohibition on shared financial exposure analysis in connection with the same underlying claim.
> (vi) prohibition on shared reserve-setting or financial exposure modeling across such lines in connection with the same underlying claim.
> (vii) prohibition on coordinated claims-handling directives where Defendants share financial exposure across both underlying and derivative malpractice risk.

k. An order prohibiting Defendants, as to Plaintiff and substantially related matters, from participating in claims handling or litigation strategy where they have financial exposure on both underlying medical malpractice liability and derivative legal malpractice risk;

l. Appointment of an independent monitor, or such other compliance and reporting mechanism as the Court deems appropriate, to ensure adherence to the foregoing structural and disclosure requirements;

m. In the alternative, and only upon a showing that the foregoing measures are insufficient to eliminate the conflicts and anticompetitive effects alleged, an order requiring Defendants to divest or otherwise separate ownership or control of either their medical malpractice or legal malpractice insurance operations;

n. Such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury.

Dated: 27 April, 2026

Respectfully submitted,
s/Ari Teman
Ari Baruch Teman
Pro Se

Mail:   1521 Alton Road #888
Miami Beach, Fl 33139
ari@teman.com
781-718-3375 (m)
Currently in Tel Aviv, Israel

21