UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ARI BARUCH TEMAN,

Plaintiff,

—against—

MEDPRO GROUP INC.; SOMERSET SERVICES LLC d/b/a ATTORNEY PROTECTIVE; SCOTT PATRICK; ZELDES NEEDLE & COOPER, P.C.; JEREMY VIRGIL; MAXIMINO MEDINA, JR.; ROBERT S. COOPER; JASON T. PRUEHER; THE FLOOD LAW FIRM, LLC; LEWIS BRISBOIS BISGAARD & SMITH LLP; CRISTINA YANNUCCI; SAMUEL COHEN; DANAHER LAGNESE, P.C.; and SILVER HILL HOSPITAL, INC.,

Defendants.

------------------------------------------------------------------X

**Case No. 1:26-cv-03517-LJL**

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff Ari Baruch Teman ("Plaintiff" or "Teman"), appearing *pro se*, files this First Amended Complaint as of right pursuant to Fed. R. Civ. P. 15(a)(1)(B), within twenty-one days after service of the first motion under Rule 12(b) in this action (ECF 43–44, served July 10, 2026), and alleges as follows:

This First Amended Complaint supersedes the original Complaint and responds to the record as it now stands, including the three pending motions to dismiss (ECF 43–44; ECF 45–47; ECF 48–50) and the July 8, 2026 production of a portion of Plaintiff's client file, which Plaintiff first reviewed in the days that followed. Every defendant named in the original Complaint is retained. Defendants Jason T. Prueher and The Flood Law Firm, LLC are added because the produced client file first revealed their roles. Plaintiff withdraws the claims previously asserted under Section 2 of the Sherman Act and the previously pleaded claims for tortious interference,

unjust enrichment, and legal malpractice, and no longer pleads injunctive relief as a standalone count (the injunctive relief sought is preserved in the Prayer for Relief). Plaintiff's racketeering claims are re-pleaded in narrowed and rebuilt form, grounded in the specific chronology and documentary record set forth below.

## I. NATURE OF THE ACTION

1. This action arises from a continuing course of conduct that denied Plaintiff timely and complete access to his own client file and to the records revealing what his former attorneys had done — and failed to do — in the matters entrusted to them. Plaintiff alleges that his former attorneys concealed adverse facts and records at two critical junctures, concealed a disqualifying conflict of interest and suppressed evidence of an adversary's fraudulent litigation practices, then refused repeated demands for the complete file, imposed conditions inconsistent with Plaintiff's possessory rights, and, after their professional liability insurers received direct and repeated notice, maintained the deprivation with those insurers' financing and, upon information and belief, their approval and participation within the claims structure they controlled.

2. The first episode occurred in October 2017. On the eve of a scheduled trial in *Silver Hill Hospital, Inc. v. Teman*, Plaintiff learned by auto-responder — not from his lawyers — that his lead trial counsel, Defendant Jason T. Prueher, had left the firm weeks earlier. The produced record now shows that Prueher continued to shape the case from his new firm without disclosure to the client; that the firm's trial-preparation record contained none of the ordinary instruments of trial readiness; and that the firm's response to its client's written plea to the partnership was a same-day letter, a motion to withdraw, and a motion for a continuance, assembled in a single seventeen-minute drafting-and-scanning session — followed within days by a $40,000 settlement executed on the morning of trial. Plaintiff alleges that the settlement, and the general release it contained in

Case 1:26-cv-03517-LJL Document 5-1 Filed 07/20/26 Page 3 of 76

favor of Defendants Silver Hill Hospital, Inc. and Danaher Lagnese, P.C., were procured through concealment, coercion, and duress, and that the record demonstrating it remained hidden inside the withheld client file until July 2026.

3. The second episode occurred in 2022 and 2023. While an unopposed dismissal motion was pending against Plaintiff in the Braverman action following a 90-day demand his attorneys had signed for and never answered, Defendants Zeldes Needle & Cooper, P.C. and Jeremy Virgil, responding directly to their client's written inquiries, described the case in terms that concealed the motion, the notice, and the risk. When the action was dismissed with prejudice, they disclosed nothing for weeks; when Plaintiff demanded the adverse record, they first transmitted only their own late-filed papers, and then an archive described as containing "everything."

4. The produced file also revealed, for the first time, the circumstances from which Plaintiff pleads, on information and belief, an undisclosed conflict of interest beneath both episodes. The file records — in lead trial counsel's own words — that "none of them are willing to testify against Silver Hill," as counsel struggled to field experts and witnesses in the matters adverse to Silver Hill. ZNC simultaneously maintained and marketed a healthcare transactional practice whose prospects depended on relationships within the same Connecticut healthcare community in which Silver Hill is a major charitable institution affiliated with numerous other providers. ZNC never disclosed any such interest to Plaintiff, and no conflict analysis, waiver, or disclosure appears anywhere in either production. And when Plaintiff furnished his attorneys with evidence — including a contemporaneous audio recording of a Connecticut state marshal, made with the marshal's consent — that Silver Hill and its counsel routinely procured default judgments

through service at addresses known to be bad, evidence bearing directly on the value and posture of Plaintiff's claims and defenses, his attorneys did not use it.

5. Beginning no later than March 2026, Plaintiff repeatedly placed Somerset Services LLC d/b/a Attorney Protective, MedPro Group Inc., Scott Patrick, and MedPro's President and Chief Executive Officer, Timothy Kenesey, on notice of the file demand, the governing client-file law, and the continuing deprivation. Plaintiff alleges that those defendants exercised substantial practical control over the litigation response through their selection and retention of defense counsel, financing of the defense from the first dollar, authority over resolution of the covered claim, and — upon information and belief — review and approval of the expenses of the funded work, and that after notice they knowingly enabled, authorized, or ratified the continued denial of complete access — including through conditions on the file's return communicated in writing by the counsel they appointed, Defendants Cristina Yannucci and Samuel Cohen of Defendant Lewis Brisbois Bisgaard & Smith LLP.

6. On July 8, 2026, after this action was filed, ZNC produced approximately 5,390 files totaling approximately 21.7 gigabytes. Plaintiff alleges that the production was materially incomplete because it omitted known client communications that Plaintiff himself holds — including the 2021–2023 correspondence quoted below, none of which appears in the production — contained no native email messages or mailbox files, included no identified production for certain represented matters (including the Buch matter and *United States v. Teman*), was accompanied by no statement of the custodians or repositories searched, and was followed by counsel's written acknowledgments that native emails, attachments, and calendar records exist at ZNC and had not been produced. Only after this action was filed, and after all three motions to dismiss were filed, did native email begin to appear — in a staged supplemental production,

delivered on or about July 17, 2026, that remains incomplete on its face. Plaintiff seeks delivery of the remaining file, damages for the prolonged and coordinated deprivation, damages for the frauds the withheld record concealed, and rescission of the release procured through those frauds.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c), because Counts IX and X arise under the laws of the United States, and pursuant to 28 U.S.C. § 1367(a) over the related state-law claims, which arise from the same common nucleus of operative fact — the Silver Hill and Braverman representations, the settlement and release procured in October 2017, and the concealment and withholding of the client file that hid the operative record until July 2026 — and form part of the same case or controversy.

8. This Court independently has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Plaintiff is a citizen of Florida. Upon information and belief: ZNC is a Connecticut professional corporation with its principal place of business in Connecticut; Virgil, Medina, Cooper, and Prueher are citizens of Connecticut; The Flood Law Firm, LLC is, based on Connecticut Secretary of State records and the location of its practice, a Connecticut limited liability company whose members are, upon information and belief, citizens of Connecticut; Danaher Lagnese, P.C. is a Connecticut professional corporation with its principal place of business in Connecticut; Silver Hill Hospital, Inc. is a Connecticut corporation with its principal place of business in Connecticut; MedPro Group Inc. is an Indiana corporation with its principal place of business in Indiana; Somerset Services LLC d/b/a Attorney Protective is, based on insurance regulatory filings and Defendants' own public materials describing Attorney Protective as a MedPro Group company, a limited liability company whose sole member is, upon information and belief, MedPro Group Inc. or another Indiana-citizen affiliate; Lewis Brisbois Bisgaard &

Smith LLP is a limited liability partnership none of whose partners is, upon information and belief, a citizen of Florida; Patrick is a citizen of a state other than Florida; and Yannucci and Cohen are citizens of states other than Florida. No defendant is a citizen of Florida. Federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1964(c) and supplemental jurisdiction under 28 U.S.C. § 1367(a) do not depend on these citizenship allegations.

9. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff alleges, among other things: that the October 2017 settlement of $40,000 — of which Plaintiff received a check for $25,000 — was procured by fraud, concealment, and duress and undervalued released claims by well over the jurisdictional threshold; that the suppressed evidence of Silver Hill's and its counsel's alleged service-and-default practices, had it been investigated and lawfully deployed, could have materially affected the posture and settlement value of Plaintiff's claims and defenses; that the client-file materials that remain withheld have substantial independent value; and that Plaintiff has incurred itemizable costs of recovery, including data-processing and storage costs for a 21.7-gigabyte production, service and filing costs attributable to recovering his property, and the costs of reconstructing from his own archives the correspondence omitted from the production.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in and were directed into this District: the 2026 refusals and conditions alleged in Part V.G were authored and transmitted by LBBS attorneys from LBBS's New York City offices (140 Broadway and 7 World Trade Center, per the face of the correspondence); the client-file demands, refusals, and productions concerned and were directed into litigation pending before this Court; the July 8 and July 17, 2026 productions were made in and into this District's litigation; and Danaher has invoked the October

11, 2017 release in this District as a bar to Plaintiff's claims (ECF 47), placing its validity in controversy here. Venue is also proper pursuant to 18 U.S.C. § 1965(a)–(b) as to Counts IX and X, and, in the alternative, pursuant to 28 U.S.C. § 1391(b)(3).

11. This Court has personal jurisdiction over each Defendant, on defendant-specific grounds. ZNC, Virgil, Medina, and Prueher prosecuted, managed, and appeared in the Braverman action in the Supreme Court of the State of New York, New York County, on Plaintiff's behalf, transacting business in New York within the meaning of CPLR 302(a)(1); the claims against them arise from that New York representation, from communications concerning it, and from the concealment and withholding of a New York court record and the New York-action client file. Flood is subject to jurisdiction because the undisclosed work Prueher performed through its systems was work on the New York action, and vicariously. Yannucci, Cohen, and LBBS acted from LBBS's New York City offices, where LBBS maintains offices and practices. Attorney Protective and MedPro selected, financed, and directed counsel in litigation pending in New York, directed the communications described in Part V.H into New York litigation, and, upon information and belief, regularly transact insurance business in New York; jurisdiction as to Counts IX and X is additionally proper under 18 U.S.C. § 1965(b) as to the defendants named in those Counts (ZNC and Virgil). Patrick is subject to jurisdiction for the acts alleged, directed at New York litigation, in the capacity described above. Silver Hill and Danaher are subject to jurisdiction with respect to the claims against them because the October 11, 2017 release has been invoked in this District as a bar to Plaintiff's claims (ECF 47), placing its validity in controversy in this forum, and because Count VI responds defensively to that invocation; in the alternative, Plaintiff will seek transfer rather than dismissal of any claim as to which jurisdiction or venue is found wanting, pursuant to 28 U.S.C. §§ 1406(a) and 1631.

12. This action seeks, among other relief, the relief this Court identified in its April 21, 2026 Order in the related action, *Teman v. Zeldes Needle & Cooper*, No. 24-cv-9830 (the "Related Action"), as available through a proceeding to recover a former client's file. No claim concerning the Silver Hill representation has been pleaded in the Related Action, in which the Court has limited the malpractice claim to the Braverman/PATH matter. No legal malpractice claim is pleaded in this action.

## III. PARTIES

13. Plaintiff Ari Baruch Teman is an individual and a citizen of Florida. He is domiciled in Florida, maintains his office in Miami Beach, and is temporarily in Israel for medical treatment with the intention of returning to Florida when medically cleared to travel.

14. Defendant Zeldes Needle & Cooper, P.C. ("ZNC"), named in the original Complaint as Zeldes Needle Cooper LLP, is a Connecticut professional corporation that represented Plaintiff in multiple matters, including the Braverman/PATH actions and the Silver Hill action.

15. Defendant Jeremy Virgil is an attorney and, at relevant times, a principal of ZNC. He was counsel of record for Plaintiff and, at relevant times, the custodian of Plaintiff's client file. He used a personal email account, jvirgil.znc@gmail.com, in the representation.

16. Defendant Maximino Medina, Jr. was at relevant times a senior attorney and managing partner of ZNC. He authored the October 8, 2017 letter described below, whose Word source bears his name as creator and Virgil's as last modifier; his transmitting emails to Plaintiff survive in the produced record only as scans; the firm's Connecticut Judicial Branch e-filing account in the Silver Hill matter was MMEDINA@ZNCLAW.COM; and he was copied on Virgil's May 15, 2023 email to Plaintiff described below.

Case 1:26-cv-03517-LJL Document 51 Filed 07/20/26 Page 9 of 76

17. Defendant Robert S. Cooper is an attorney and, at relevant times, a partner of ZNC. He was among the thirteen named ZNC partners to whom Plaintiff addressed his October 6, 2017 email described below; per Medina's October 8, 2017 letter, Plaintiff's email was provided "to many of my partners" and the firm's response reflected in that letter was the product of partnership-level discussion and decision in which, upon information and belief, Cooper participated; and his ZNC email address, rcooper@znclaw.com, was among the addresses copied on the 2026 correspondence concerning Plaintiff's client-file demand described below.

18. Defendant Jason T. Prueher is an attorney who, until on or about September 18, 2017, was employed by ZNC and served as Plaintiff's lead trial counsel in the Silver Hill action. He used a personal email account, prueher76@gmail.com, during the representation. On or about September 18, 2017 he joined The Flood Law Firm, and thereafter continued to perform and transmit work concerning Plaintiff's case, without disclosure to Plaintiff. Upon information and belief, Prueher subsequently practiced at Gould Injury Law (using the address jprueher@gouldinjurylaw.com, which appears in the 2026 correspondence described below) and is presently associated with Morgan & Morgan. Client-file materials in his possession, custody, or control follow him regardless of firm affiliation.

19. Defendant The Flood Law Firm, LLC ("Flood") is, upon information and belief, a Connecticut limited liability company and Prueher's employer from on or about September 18, 2017 until his subsequent departure. Client-file materials concerning Plaintiff's representation — including the September 22, 2017 witness memorandum described below — were created on or transmitted through Flood's systems and, upon information and belief, remain in Flood's possession, custody, or control.

20. Defendant Silver Hill Hospital, Inc. ("Silver Hill") is a Connecticut corporation operating a psychiatric hospital in New Canaan, Connecticut. Silver Hill was the plaintiff in *Silver Hill Hospital, Inc. v. Teman*, No. FST-CV14-6022274-S (Conn. Super. Ct.), and is a releasee under the October 11, 2017 settlement agreement described below.

21. Defendant Danaher Lagnese, P.C. ("Danaher") is a Connecticut professional corporation and law firm that represented Silver Hill in the Silver Hill action, including in responding to Plaintiff's counterclaims and in negotiating the October 2017 settlement, and is a releasee under that settlement agreement.

22. Defendant Somerset Services LLC d/b/a Attorney Protective ("Attorney Protective") administers the Attorney Protective lawyers professional liability program under which ZNC's policy was issued, services that policy, and makes claims-handling decisions under it. The policy is written on the paper of National Liability & Fire Insurance Company, a Berkshire Hathaway insurance subsidiary; Attorney Protective is itself a MedPro Group and Berkshire Hathaway company.

23. Defendant MedPro Group Inc. ("MedPro") is Attorney Protective's corporate parent. Its senior leadership and legal compliance function received the communications described below.

24. Defendant Scott Patrick is the President and chief executive of Attorney Protective; upon information and belief based on his public professional biography, he was among Attorney Protective's first employees and has helped lead the division since its founding in or about 2009. He personally received, at his individual email address, the communications described below.

25. Defendant Lewis Brisbois Bisgaard & Smith LLP ("LBBS") is a law firm appointed by the Insurer Defendants to defend ZNC and Virgil in the Related Action and in this action. The

written communications concerning Plaintiff's client file described below were authored and transmitted by its attorneys, Defendants Yannucci and Cohen, acting within the scope of their employment and of LBBS's engagement.

26. Defendant Cristina Yannucci is an attorney at LBBS and authored written communications imposing conditions on the return of Plaintiff's file, as described below.

27. Defendant Samuel Cohen is an attorney at LBBS involved in the same representation, and authored or transmitted written communications concerning the file and its production, as described below.

28. Attorney Protective, MedPro, and Patrick are referred to collectively as the "Insurer Defendants." ZNC and Virgil are referred to collectively as the "ZNC Defendants."

## IV. SUMMARY CHRONOLOGY

29. The course of conduct alleged in this Complaint is summarized chronologically below and detailed in Part V:

2014 — Silver Hill, represented by Danaher and by Mark Sank & Associates, LLC, commences a collection action against Plaintiff; Plaintiff counterclaims.

2014–2017 — during the Silver Hill litigation, Plaintiff obtains, and furnishes to his ZNC attorneys, evidence — including a contemporaneous audio recording of a Connecticut state marshal — that Silver Hill's counsel routinely caused service to be made at addresses known to be bad and took defaults against Silver Hill's former patients; the transmittal is referenced in the October 2017 client email record ZNC itself produced (ZNC089167).

September 6, 2017 — Plaintiff emails Prueher and Virgil requesting a "Meeting with Partners" because he felt his counsel was "being outgunned"; no reply.

September 18, 2017 — Prueher leaves ZNC for Flood; no notice to the client.

September 22, 2017 — Prueher, from Flood's systems, transmits a witness-selection memorandum on Plaintiff's case; no disclosure to the client.

30. The produced record establishes, and Plaintiff alleges, that after Prueher departed ZNC he continued to perform and direct substantive work on Plaintiff's matters — including the witness-selection memorandum transmitted from The Flood Law Firm's systems described above — without notice to Plaintiff, without Plaintiff's informed consent, without any engagement between Plaintiff and Flood, and, upon information and belief, without any conflicts check or new-matter intake at Flood, whose systems and personnel were nonetheless used for the work. Neither Prueher nor Flood ever disclosed this arrangement to Plaintiff; Plaintiff learned of it from the client file produced in July 2026. The produced email record also reflects the arrangement's consequence inside ZNC: reply messages produced without their parent messages — threads whose missing halves, upon information and belief, are Prueher's side of the correspondence — show Virgil dependent on the departed Prueher for basic information about Plaintiff's cases in the period before trial, while neither Virgil nor Prueher informed the Court or Plaintiff of the departure or sought the time that the loss of lead trial counsel required.

October 6, 2017 — Plaintiff learns of the departure from an auto-responder; that evening he emails thirteen named ZNC partners, including Robert Cooper: "I was informed TODAY by AUTO RESPONDER my main attorney quit and trial is WEDNESDAY."

October 8, 2017 — in one seventeen-minute session, ZNC drafts and scans the Medina letter, a Motion to Withdraw Appearance, and a Motion for Continuance of the trial.

October 10–11, 2017 — Plaintiff travels to the Stamford courthouse; the coercive overnight events alleged below occur; a $40,000 settlement in execution form, releasing Silver Hill, Danaher, and others, is scanned at 12:58 p.m. on the trial date.

October 16, 2017 — ZNC prepares an unsigned “Settlement Statement” (ZNC079386): Plaintiff’s caption and case costs joined to a $58,333.33 fee exceeding the $40,000 settlement, an unrelated matter’s injury description, and an impossible “net due client” — a mis-assembled template, and the only settlement accounting in the file.

December 8, 2017 — ZNC transmits a $25,000 check to Plaintiff; no produced document reconciles the $40,000 settlement, the statement’s figures, and the $25,000 payment.

February 11–14, 2022 — the Braverman defendants serve, and ZNC signs for, a 90-day demand under CPLR 3216; ZNC never responds to it and never tells Plaintiff it exists.

May 17, 2022 — the Braverman defendants move to dismiss for failure to prosecute; ZNC files no opposition.

June 15, 2022 — Virgil sends Plaintiff a substantive analysis of consolidating the Braverman and Buch cases, without mentioning the pending dismissal motion.

September 7, 2022 — the dismissal motion is deemed fully submitted without opposition; September 19, 2022 — ZNC files untimely objection papers.

November 5 and 9, 2022 — in response to Plaintiff’s demands for status and action, Virgil describes the case in terms that conceal the dismissal motion and the 90-day notice.

April 12–14, 2023 — the Braverman action is dismissed with prejudice; ZNC’s appeal drafting begins April 14; the complete motion record is assembled at ZNC by April 17.

May 9–12, 2023 — Virgil first discloses the dismissal, mischaracterizes it, transmits only ZNC’s own late papers in response to demands for the adverse record, and then sends “Teman Filings.zip” with the message “This should have everything.”

2023–2026 — the complete client file is not returned.

December 2024 — the Related Action is commenced; March–May 2026 — the Insurer Defendants receive repeated written notice of the file demand, the governing law, and the continuing deprivation.

April 21, 2026 — this Court confirms Plaintiff's presumptive right to the file and identifies a proceeding to recover it; April 23, 2026 — insurer-appointed counsel responds by conditioning the file's return on identification of documents and payment; April 27, 2026 — this action is filed.

June 22, 2026 — insurer-appointed counsel asserts in writing that ZNC represented Plaintiff in only two litigations, refuses the Buch and criminal-matter files, and demands approximately $4,179–$4,404 in eDiscovery vendor costs.

July 8, 2026 — ZNC produces approximately 5,390 files; the production omits, among other things, the very correspondence quoted in this Complaint and contains no native email.

July 13 and 15, 2026 — counsel acknowledges in writing that non-privileged emails, email attachments, and Outlook calendar records exist at ZNC and were not produced, and declines to confirm whether ZNC maintained client files for the Buch matter or *United States v. Teman*.

On or about July 17, 2026 — after all three motions to dismiss have been filed, Defendants deliver a supplemental production containing the first native email messages produced in any form; on initial review it remains incomplete, including one-sided email threads whose initiating messages are absent.

## V. FACTUAL ALLEGATIONS

### A. The Representation and the Custodians of Plaintiff's File

31. ZNC represented and advised Plaintiff in multiple matters, including the Braverman/PATH actions (New York and Connecticut) and the Silver Hill action, and its attorneys advised Plaintiff concerning, and coordinated with counsel in, related matters including the Buch matter and *United States v. Teman*. The scope of a client file is defined by the conduct and substance of the representation — the matters on which the attorneys in fact advised and acted — not by the captions of the cases ultimately filed, and not by the four corners of a retainer agreement. Counsel's June 22, 2026 assertion that ZNC "only provided [Plaintiff] with legal representation in two litigations" is contradicted by the conduct of the representation reflected in the record.

32. ZNC attorneys used personal email accounts in the representation. Seven produced emails were sent from jvirgil.znc@gmail.com "on behalf of" Virgil's firm address between April 2016 and April 2017, carrying discovery strategy, settlement-authority discussions, Plaintiff's medical data, and the firm's withdrawal discussion. Prueher used prueher76@gmail.com during the representation. The July 8, 2026 production contains no collection from either account: prueher76@gmail.com returns zero occurrences in the production, and no folder or path in the production reflects any collection from Virgil's devices or personal account.

33. Portions of Plaintiff's client file accordingly reside in repositories beyond ZNC's firm systems — including the personal accounts identified above and, as set forth below, Flood's systems and Prueher's subsequent repositories — and any complete return of the file requires collection of client-file materials from those repositories.

**B. The October 2017 Silver Hill Trial-Eve Crisis and the $40,000 Settlement**

34. In *Silver Hill Hospital, Inc. v. Teman*, No. FST-CV14-6022274-S (Conn. Super. Ct.), trial was scheduled to begin evidence before the court (Jacobs, J.) on October 11, 2017, with

an in-chambers meeting at 9:45 a.m. that morning. Prueher was Plaintiff's lead trial counsel. Silver Hill was represented by Danaher and by Mark Sank & Associates, LLC.

35. On September 6, 2017, Plaintiff emailed Prueher and Virgil requesting a "Meeting with Partners" because, as his October 6 email records, he "felt he was being outgunned." No meeting occurred and no substantive reply appears in the produced record.

36. Effective on or about September 18, 2017 — approximately three weeks before trial — Prueher left ZNC and joined Flood. The produced record contains no notice to Plaintiff of the departure, no conflict waiver, and no engagement-change letter: a targeted review of every occurrence of Prueher's name in proximity to departure language across the entire production located none. The only notice of the departure anywhere in the produced record is the automatic email responder Plaintiff encountered on October 6, 2017 ("As of Monday, 9/18" and directing correspondents to The Flood Law Firm; ZNC089167 p.180).

37. Prueher's involvement in the case did not end with his departure — it went undisclosed, and ZNC's July 17, 2026 native production now documents both sides of it. On the morning of September 22, 2017 — nineteen days before trial — Virgil wrote to Prueher at his Flood Law Firm email address: "Judge Jacobs limited me to three of the 'new' witnesses. For some reason I have to declare which today. Who would you pick?" (ZNC097892). Prueher responded from Flood with a witness assessment concluding, among other things: "I doubt any of the above will recall anything. They don't have any notes." (ZNC097891; scanned printout at ZNC089167 p.83.) Nineteen days before trial, Plaintiff's counsel of record was outsourcing the selection of trial witnesses — due to the court that same day — to a lawyer who had left the firm, at another firm's email address, without any engagement, disclosure, or waiver, and neither ZNC, nor Virgil, nor Prueher, nor Flood disclosed any of it to Plaintiff.

38. The firm's own produced work product documents its state of trial readiness. The Silver Hill file as produced contains deposition transcripts, subpoenas, and expert disclosures — and, after a defined search of the Silver Hill folders and email exports across both productions, no located witness-preparation outlines, no deposition summaries or digests, no opening-statement drafts, and no damages presentations. The file's own words corroborate the state of readiness: an August 18, 2016 thread records that "Ari's expert fell through" (ZNC034775), and the September 22, 2017 exchange quoted above shows witness selection unresolved, and outsourced to a departed lawyer, on the day it was due to the court. The state of preparation was itself concealed from Plaintiff: proceeding to trial would have cost Silver Hill more than the settlement it paid, and Plaintiff alleges that his counsel could not credibly threaten trial because they had not prepared for one.

39. On October 6, 2017, Plaintiff discovered the departure by auto-responder. At 8:20 p.m. that evening he emailed thirteen named ZNC partners — Aceto, Carbone, Casper, Cessario, Robert Cooper, Sabata P. Fiano, Zeisler, Verrillo, Scofield, Saraco, Rintoul, Pacelli, and Charles Needle, copying Virgil — under the subject "Failure to notify me lead attorney left firm": "I was informed TODAY by AUTO RESPONDER my main attorney quit and trial is WEDNESDAY," recounting the unanswered September 6 request to meet with the partners, and stating that "Mr. Virgil is not confident of our win" with "only a few weeks to take over (and the client not even informed so as to help him!)." The firm's leadership, including Cooper, was on written notice of all of it.

40. On Sunday, October 8, 2017, the firm responded — not by preparing for trial, but by preparing its exit. The letter's Word source (ZNC065402) records creation by "Max Medina" at 4:34 p.m. EDT and last modification by "Jeremy Virgil" at 4:51 p.m. EDT — a seventeen-minute

create-to-save span across two authors — and at 4:57:59 p.m. it was scanned in a single session together with a Motion to Withdraw Appearance (ZNC077670) and a Motion for Continuance of the trial (ZNC077659). Medina's letter acknowledged that Plaintiff's October 6 email had been provided "to many of my partners," declined Plaintiff's demands, and enclosed the continuance motion — reflecting a partnership-level discussion and decision in which, upon information and belief, Cooper participated. Medina emailed the letter and motion to Plaintiff at 4:59 and 5:00 p.m.; Plaintiff replied at 5:06, 6:02, and 7:01 p.m., including the warning that counsel had failed "to notify the client (me) that lead counsel has quit."

41. On October 10, 2017, Plaintiff wrote "I will be there. I am on my way now" and traveled from New York to Stamford. On the night before trial was scheduled to begin, on or about October 10–11, 2017, on Plaintiff's personal knowledge: Virgil and Medina kept Plaintiff at the firm's offices through the night; controlled his movements and transportation; did not permit him to return home or rest, notwithstanding their knowledge of his medical condition and recent surgery; Plaintiff slept, briefly, on the floor of Virgil's office; and Plaintiff was presented with the choice of settling or proceeding to trial that morning with counsel who had moved to withdraw and whose lead trial lawyer had left.

42. On October 11, 2017 — the trial date — a settlement agreement in execution form was scanned at ZNC at 12:58 p.m., reciting consideration to Plaintiff of "FORTY THOUSAND AND 00/100 DOLLARS ($40,000.00)" (ZNC078276). The agreement releases Silver Hill Hospital, Inc., Beazley PLC, Danaher Lagnese, P.C., and Mark Sank & Associates, LLC, and their insurers, affiliates, directors, and officers; releases a second action naming, among others, Dr. Irwin Gelman; reaches Plaintiff's communications "on July 17, 2017 and between October 6, 2017

and October 10, 2017"; and binds "Teman and his attorneys, Zeldes Needle and Cooper, P.C., and Attorney Jeremy Virgil" to confidentiality.

43. The settlement's drafting history documents the suppression objectives of Silver Hill and its counsel. Settlement drafts in ZNC's file (ZNC079324, ZNC079332) carried a clause obligating Plaintiff and his attorneys "not to initiate or volunteer information to the Dep[artment] of Public Health" — a term Plaintiff had expressly rejected in writing on April 4, 2017 ("So I guess I'll be doing that in CT right after this is handed to the reporters"). The executed agreement does not contain that clause, carrying instead a narrower "except as required by law" formulation; but the demand itself — that a psychiatric patient's counsel be contractually barred from volunteering information to the state health regulator — evidences the suppression purpose. During the negotiation, Silver Hill's side also demanded, as Plaintiff recalls, that Plaintiff remove a claim of unlawful touching from his pleading.

44. On December 8, 2017, ZNC transmitted to Plaintiff a letter enclosing "your check for $25,000" (ZNC060583 p.411). The only settlement accounting for the Silver Hill matter located in either production is a ZNC "Settlement Statement" dated October 16, 2017 (ZNC079386) — and its face discredits it as an accounting of Plaintiff's settlement. It recites a "SETTLEMENT AMOUNT" of $40,000.00; "Attorneys' Fees" of $58,333.33 — a fee exceeding the entire recited settlement; total disbursements of $1,506.84; and a "NET BALANCE DUE AND OWING TO CLIENT" of $115,159.83, a figure arithmetically impossible on the document's own numbers ($40,000.00 less $58,333.33 less $1,506.84 is negative $19,840.17). Its acknowledgment paragraph describes "my claim for personal injury, arising from a fall that occurred on July 1, 2011 in Wallingford, Connecticut" — an injury description belonging to no matter of Plaintiff's, on a document otherwise carrying Plaintiff's caption and Plaintiff's own case disbursements. It is

unsigned. And it recites an authorization for ZNC "to endorse my name on the settlement check and payout in accordance herewith."

45. The statement's figures are, however, internally consistent with one another on a different premise: $115,159.83 plus $58,333.33 plus $1,506.84 equals exactly $175,000.00, and $58,333.33 is exactly a one-third contingency fee on $175,000.00 — while the itemized disbursements are Plaintiff's own Silver Hill case costs. The document is, on its face, a mis-assembled template: Plaintiff's caption and disbursements, joined to a fee, a "net due client," and an acknowledgment paragraph carried over from an unrelated $175,000 premises-liability matter and never corrected. The consequence for this action is direct: ZNC never rendered to Plaintiff any genuine accounting of his settlement. The only "Settlement Statement" in the file is unsigned, arithmetically impossible on its own figures, describes an injury that is not Plaintiff's, and recites an authorization for ZNC to endorse Plaintiff's name on the settlement check. Plaintiff received $25,000 of a recited $40,000 settlement; no produced document reconciles those figures; no signed fee agreement term, closing statement, or client authorization performing that reconciliation has been located; and ZNC's trust-account records for the settlement funds — which would resolve the question, including whether and under what authority any settlement instrument was endorsed in Plaintiff's name — appear nowhere in either production. An accounting is demanded in the Prayer for Relief.

46. The document also bears on ZNC's management of client files and records: the assembly of Plaintiff's settlement statement from an unrelated matter's financial and injury data — and its retention in that condition, uncorrected, in the file for nearly nine years — demonstrates deficient management of client records at the firm. The same record shows the deficiency running in the other direction as well: Plaintiff's own materials were scattered across personal email

accounts, another firm's systems, and a document-management system never exported, and were never fully collected (Parts V.A, V.I). These deficiencies bear directly on the reliability of ZNC's representations concerning what its files contain and on the completeness of any certification it offers.

47. For the avoidance of doubt, Plaintiff's statement in a proposed pleading in the Related Action that he "accepted" a "reduced settlement" in the Silver Hill action is consistent with, and encompassed by, the allegations of this Complaint: Plaintiff did execute and accept the settlement — under the circumstances of concealment, coercion, and duress alleged herein, and in ignorance of the concealed record, which remained inside the withheld client file until July 2026. Acceptance under duress and in ignorance of concealed material facts is precisely what makes the settlement and release voidable.

48. The record set forth in this Part — the Flood memorandum, the drafting metadata of the Medina letter, the seventeen-minute letter-withdrawal-continuance session, the trial-readiness voids, the absence of any departure notice, the settlement drafting sequence, and the $15,000 contingency-fee retention, identified as such in ZNC's contemporaneous correspondence but never documented by any closing statement or accounting, — was contained in the client file that Defendants thereafter withheld. It was first produced on July 8, 2026, and first reviewed by Plaintiff in the days that followed, on or about July 13, 2026.

**C. The Undisclosed Conflict and the Suppressed Service-Fraud Evidence**

49. The produced client file revealed, for the first time, the circumstances from which Plaintiff pleads an undisclosed and unwaived conflict of interest. ZNC maintained, marketed, and sought to grow a healthcare transactional practice — as reflected on its public website, in its marketing materials, and in Cooper's professional biography — within the same Connecticut

healthcare community in which Silver Hill, a major charitable institution affiliated with numerous other providers, holds substantial standing. Upon information and belief, a firm prosecuting claims against Silver Hill could not simultaneously expect to develop transactional relationships within Silver Hill's institutional network, and ZNC's own interests therefore stood in tension with the vigorous prosecution of Plaintiff's claims. Cooper personally led and promoted the firm's healthcare transactional practice; upon information and belief, the conflicting institutional interest alleged in this Part was his own professional interest in particular. ZNC never disclosed any such interest to Plaintiff, and no conflict analysis, waiver, or disclosure appears anywhere in either production.

50. ZNC's own file documents, in counsel's own words, the reality of opposing Silver Hill. Prueher's January 25, 2017 roster of potential psychiatric experts records, for Dr. Andrew Levin, this disposition: "Sent patients to Silver Hill. (he will not testify against Silver Hill)" — a refusal whose recorded reason was the expert's referral relationship with Silver Hill, not the merits (ZNC035504). On February 23, 2017, responding to Plaintiff's question whether the remaining candidates were "willing to go against Silver Hill," Prueher answered: "No. Out of the list below, none of them are willing to testify against Silver Hill. I have spoken to all of them." (ZNC035504.) An August 18, 2016 thread records that "Ari's expert fell through" (ZNC034775), and on September 22, 2017 — nineteen days before trial — the witness slate was still unresolved and was being assessed by a departed lawyer who concluded the candidates would "recall nothing" and had "no notes" (ZNC097891–ZNC097892). The roster of prospective experts (ZNC035504) records, for Dr. David Rudnick, counsel's notes state, "Daytime somnolence at Silver Hill means more questions should have been asked!!!" (ZNC035504; see also DEFTS035404–35405, recording a prospective expert's clinical view linking Plaintiff's daytime somnolence at Silver Hill to

excessive and unwarranted overmedication). Silver Hill's own treatment records documented that somnolence; upon information and belief, Silver Hill neither investigated it nor reported it, and — as the settlement conduct alleged in Part V.B reflects — acted instead to prevent its examination. The conflict alleged in this Part is accordingly pleaded on information and belief, from circumstances: at least one documented refusal was relationship-based rather than merits-based; the professional reality that practitioners embedded in Silver Hill's referral network would not oppose it was recorded in counsel's own roster; and ZNC's own healthcare transactional ambitions lay in that same community and referral economy. While the recorded refusals include a prospective expert unwilling to testify against Silver Hill because of his own patient-referral relationship with that institution — a financial tie to Silver Hill, not an assessment of Plaintiff's claims (ZNC035504) — the nondisclosure remains: a firm holding healthcare transactional ambitions in the community it was retained to sue owed its client disclosure of that interest, and made none.

51. The conflict had concrete consequences. During the Silver Hill litigation, Plaintiff obtained, and furnished to his attorneys, evidence that Silver Hill and its counsel procured default judgments against Silver Hill's former patients through service at addresses known to be bad. Plaintiff possesses a contemporaneous audio recording — made with the marshal's knowledge and consent — of a Connecticut state marshal who, while Plaintiff was attempting to effect service on Danaher, stated in substance that: (i) he is regularly engaged to serve process on individuals being sued by Silver Hill; (ii) when he determines that a service address is bad, he reports that fact to Silver Hill's counsel; (iii) counsel nonetheless proceed to have service made at the bad address and submit returns of service to the court as though the defendant had been served; and (iv) default judgments are then taken against the unserved defendants. Plaintiff's transmittal of this evidence to

his attorneys is referenced in the October 2017 client email record that ZNC itself produced (ZNC089167; native counterparts in the July 17, 2026 production).

52. This evidence was of extraordinary value to Plaintiff's litigation position. It bore on the integrity of Silver Hill's collection-judgment portfolio — default judgments procured through knowingly defective service are subject to vacatur — and its exposure of Silver Hill's and its counsel's practices could have materially affected the posture and settlement value of Plaintiff's claims and defenses, and carried professional-discipline exposure for the responsible counsel. Despite being provided this evidence, Virgil, Medina, Cooper, and ZNC did not investigate it, did not deploy it, and did not disclose to Plaintiff that their reluctance was informed by the firm's own interest in preserving its standing with Silver Hill's institutional network. Plaintiff alleges that, at the moment of decision, his attorneys chose their prospective transactional relationships over their existing client.

53. The facts alleged in this Part resided within ZNC's internal notes, communications, and work product — inside the client file that was withheld from Plaintiff until July 8, 2026 — and were first reviewed by Plaintiff on or about July 13, 2026.

**D. Plaintiff's Presumptive Right to the Entire File**

54. Under New York law, upon termination of the attorney-client relationship, a client presumptively has full access, with narrow exceptions, to the entire attorney's file in each represented matter. *Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP*, 91 N.Y.2d 30, 34–35 (1997). The attorney bears the burden of identifying any narrow category withheld and the basis for withholding it. The right attaches matter by matter and includes the file in native form.

55. This right is distinct in kind from litigation discovery. It does not depend on the relevance of any document to any pending action; it depends on the existence of the representation.

Case 1:26-cv-03517-LJL Document 62-1 Filed 07/20/26 Page 25 of 76

This Court's April 21, 2026 Order confirmed the presumptive right and identified a proceeding to recover the file as the appropriate vehicle. This action seeks that relief.

**E. The Concealed Default in the Braverman Action (2022–2023)**

56. The client file also documents a default that ZNC and Virgil concealed from Plaintiff while it happened. In the Braverman action, by order dated August 16, 2016, Plaintiff was directed to file a Note of Issue by June 1, 2017; ZNC never complied. On February 11, 2022, the Braverman defendants served a 90-day demand under CPLR 3216 that Plaintiff resume prosecution; ZNC signed for it on February 14, 2022 (signed receipt at ZNC000841), never responded to it, and never told Plaintiff it existed. On May 17, 2022, the Braverman defendants moved to dismiss for failure to prosecute; ZNC filed no opposition, and the motion was deemed fully submitted without opposition on September 7, 2022. ZNC's only response — objection papers drafted by associate Kyle Souza on September 16, 2022 (drafting metadata at ZNC000122) — was filed on September 19, 2022, months late. On April 12, 2023, the court dismissed the action with prejudice (ZNC000887), reciting that "Plaintiff has not submitted opposition to the motion" and that the untimely "Objection" "will not be considered."

57. While the 90-day clock ran and the unopposed motion was pending, Virgil communicated with Plaintiff by interstate wire, in response to Plaintiff's written inquiries and demands, in terms that concealed all of it. On June 15, 2022 — six days after the dismissal motion's return date — Virgil sent Plaintiff a substantive analysis of consolidating the Braverman and Buch cases, with no mention of the pending motion or the notice. On November 5, 2022, Virgil wrote: "There's a motion pending with the court where the court has to decide whether it will let this case proceed forward despite the bankruptcy/insolvency filings of one of the insurance carriers. I don't have a timeline on when/if it'll be ruled on." On November 9, 2022, he wrote: "The court has the

motion. It's recent. It's already there for them to decide." The dismissal motion had by then been on file for six months and fully submitted, without opposition, for two. At no time in 2022 or 2023 did ZNC or Virgil disclose to Plaintiff the 90-day notice, the unopposed dismissal motion, or the risk that the action would be dismissed.

58. ZNC's knowledge of the dismissal is documented to the day. The order was signed April 12, 2023 and entered on NYSCEF April 14, 2023; ZNC's own production contains notice-of-appeal drafts created April 14, 2023 (ZNC008846); and the archive Virgil later transmitted to Plaintiff records that the complete motion record, including the dismissal order, was assembled or saved in a concentrated session on April 17, 2023, between approximately 10:19 and 10:36 a.m. The archive timestamps do not identify the individual user, but they demonstrate that the adverse motion record had been collected at ZNC weeks before Plaintiff received it. Across ZNC's produced documents from both the 2022 objection window and the 2023 post-dismissal window, no document reflects the client being informed of the notice, the motion, the unopposed posture, or the dismissal.

59. Virgil disclosed the dismissal on May 9, 2023 — twenty-seven days after entry, and only in response to Plaintiff's May 6 instruction to file a motion — writing: "Sorry. I cannot do that. Rather than grant my request for leave from the stay to do discovery the court just dismissed the case. I have filed an appeal." The message did not disclose that the dismissal was for failure to prosecute, that the motion had gone unopposed, that a 90-day notice had been received fifteen months earlier and never answered, or that ZNC's only response had been filed months late and disregarded. The May 9, 2023 disclosure email itself — like every 2021 and 2022 communication quoted in this Part — is absent from both of ZNC's productions, and exists in the record only because Plaintiff preserved it in his own archive.

60. Plaintiff demanded the record. On May 10, 2023, having read the order, Plaintiff wrote: “My concern is that I repeatedly asked you for updates and you told me the case was stayed but never told me about these documents the opposing party filed,” and demanded all documents referenced in the order. On May 11, 2023, Virgil responded “Attached are the motions that I filed,” transmitting only ZNC’s own untimely objection papers (NYSCEF 197–199) — not the adverse documents Plaintiff had by then demanded twice.

61. On May 11–12, 2023, after Plaintiff’s third demand and his written statement that he would seek malpractice counsel, Virgil transmitted “Teman Filings.zip” with the message: “This should have everything.” The archive contained the NYSCEF record of the dismissal sequence. Its transmission was the first time Plaintiff received the 90-day notice — fifteen months after ZNC signed for it — the unopposed dismissal motion, and the order and judgment ending his case. On May 15, 2023, Virgil — copying Medina — asked whether Plaintiff was terminating the representation.

**F. Plaintiff’s Demands for His Records**

62. Plaintiff’s written demands for his documents and records are in the record. On November 4, 2022, Plaintiff wrote to Virgil: “please seek updated discovery, including documents from all parties discussing me and my case.” On May 10–12, 2023, he made the three demands quoted above. On June 21, 2023, he demanded: “Please send a copy of everything filed to me and Eden,” repeating the demand on August 21 and August 24, 2023. On April 16, 2026, Plaintiff transmitted a formal written demand entitled “Request for Complete Client File” to ZNC’s counsel of record, to Virgil at his ZNC address, and to former ZNC attorneys, with copies to Attorney Protective and Patrick.

63. The complete file was not returned. In 2023, ZNC and Virgil responded to Plaintiff's demands with the selective transmissions described in Part V.E; thereafter, for years, they transmitted nothing further.

**G. The 2026 Refusals and the Conditions Imposed by Insurer-Appointed Counsel**

64. Following Plaintiff's April 16, 2026 formal demand and this Court's April 21, 2026 Order, the return of the file was conditioned, in writing, on demands inconsistent with New York law. On April 23, 2026, at 11:32 a.m., Yannucci transmitted an email to Plaintiff — copying Patrick, Attorney Protective, MedPro's chief executive and compliance functions, Virgil, Cooper (rcooper@znclaw.com), and Prueher (jprueher@gouldinjurylaw.com), among others — stating, as to files "other than those addressed by the Court's Order": "please identify the 'files' you seek, as well as instructions for the production – paper or electronic. In response, ZNC will assess the cost of such production and provide you with an estimate and thereafter an invoice for same, payment of which will be required." This email is now in the record of this action as an exhibit to defense counsel's own declaration (ECF 49-5).

65. The distribution list of that communication is itself evidence of the decision structure. Appointed counsel herself directed a client-file communication — correspondence about a former client's property demand, not about the defense of any claim — to the President of Attorney Protective and to MedPro's chief executive and compliance functions. Counsel does not copy an insurer's President and the parent organization's chief executive on correspondence concerning a client-file demand unless those recipients are part of the decision-making structure for that subject. Yannucci's own routing corroborates that the file-response decisions were made within, and reported to, the structure the Insurer Defendants maintained — and that Patrick and Kenesey were personally within that loop.

66. On June 22, 2026, Yannucci transmitted a letter to Plaintiff that: (i) asserted that "ZNC never represented you in any legal matter or proceeding beyond the PATH/Braverman and Silver Hill Actions" and refused, on that ground, any production for the Buch matter or *United States v. Teman*; (ii) asserted incurred and anticipated eDiscovery vendor costs of approximately $4,179.20 to $4,404.20 and requested Plaintiff's agreement to pay them; and (iii) acknowledged that ZNC would "produce your client files prior to resolution of said dispute" if Plaintiff agreed to the production specifications while disputing costs. The letter thereby confirmed that production had been feasible throughout the years of demands, while continuing to withhold the Buch and criminal-matter materials and the native repositories described in Part V.I.

67. Plaintiff's claim does not depend on the proposition that any request for costs was unlawful. The Court's June 9, 2026 Order in the Related Action directed Defendants to indicate the cost of production and reserved judgment on whether Plaintiff must pay it, and New York authority permits a lawyer to charge reasonable assemblage and delivery costs. Plaintiff does not allege that every reasonable cost of collecting and delivering a client file is impermissible. He alleges that the demanded costs included discovery-style conversion and Bates-processing that he had expressly declined — reiterating in writing that he sought his files as natively maintained, not converted or Bates-stamped versions — and that was unnecessary to that request. Native delivery and litigation discovery are distinct, and the July 17, 2026 production demonstrated that native messages existed and could be delivered. The reasonableness and allocation of any genuine collection and delivery costs remain distinct from the years of nonproduction, the categorical exclusions, and the conditions alleged herein. The unlawfulness alleged lies elsewhere: in conditioning any production on Plaintiff first identifying the documents he sought (April 23, 2026: "please identify the 'files' you seek" followed by an invoice "payment of which will be required"); in excluding entire matters

from the file on an account of the representation contradicted by the record (Part V.A); in withholding native materials already maintained and collectible (as the July 17, 2026 delivery proved); and in withholding undisputed materials for years before and during any cost dispute. The June 22, 2026 letter's statement that ZNC would produce prior to resolution of the cost dispute is acknowledged — and it confirms both that production was feasible throughout and that the years of prior non-delivery, and the categories still withheld after July 8, cannot be attributed to the cost question.

68. The conditions were not an improvisation; counsel described them as an established course. Beginning on March 24, 2026 — a Zoom conference scheduled by Yannucci, whose calendar invitation identified the participants as Plaintiff, Yannucci, and Cohen — and continuing in further conferences by video and telephone through July 2026, Plaintiff met and conferred with Yannucci and Cohen concerning both his discovery demands in the Related Action and his independent demand for his client file. In these conferences Plaintiff stated in substance that the client file was his property, that ZNC's obligation to return it existed independently of litigation discovery, and that appointed counsel could not use the discovery process to delay delivery of property ZNC was already obligated to surrender. In response, one of Yannucci or Cohen stated, "This is how we do this" and "We have done this for years," while the other was present. Plaintiff's present recollection is that Yannucci was the speaker, but his contemporaneous notes do not identify the speaker and he cannot now distinguish the speakers' voices with sufficient confidence to make a definitive attribution. Plaintiff therefore alleges that one of the two attorneys made the statements in the other's presence. In context, Plaintiff understood "this" to refer to the course then under discussion: delaying and conditioning production, imposing identification and cost conditions, requiring the former client to resort to litigation, and routing the independent client-file

demand through the insurer-funded litigation response. Thereafter, both attorneys participated in the documented communications and productions alleged below. Plaintiff pleads these statements from his personal participation in the conversations. No complete recording or transcript of the conferences exists. During one such conference, after it had begun and without prior notice to Plaintiff, Plaintiff's Otter.AI transcription application was disabled through conference host controls, notwithstanding the parties' prior written agreement permitting transcription. Plaintiff contemporaneously attributed the action to Cohen and reported it to the Court in the Related Action by letter filed June 2, 2026, before any claim against counsel had been pleaded in this action.

69. The meet-and-confer addressed both litigation discovery and the independent client-file demand, and Plaintiff expressly distinguished the two. Counsel nevertheless described their established course as applying to both, and thereafter continued to route the independent client-file demand through the insurer-funded litigation response.

70. The described course was then implemented through the documented acts alleged in this Part and in Part V.I: the April 23, 2026 identification-and-payment conditions; the June 22, 2026 categorical exclusions and vendor-cost demands; the July 8, 2026 production omitting the identified native, custodial, temporal, and matter-specific categories; and the July 17, 2026 supplemental delivery after the motions to dismiss had been filed, with identified categories still absent. The statements, together with the implementation that followed, support the inference that the challenged course was deliberate and reflected an established method of the speakers and their firm — not an accidental production omission or a misunderstanding peculiar to any one communication.

71. The withholding also served a concrete concealment and delay function in the Related Action. Through the same appointed counsel, and while the client file remained withheld,

the ZNC Defendants maintained before this Court that the Silver Hill matter was separate from and unrelated to the Braverman/PATH representation, and used that position to support redactions, a narrowed set of custodians, and a motion for a protective order. The withheld records contradicted that position: ZNC's own chronology was captioned "Legal/medical case involving Dr. Eric Braverman and Silver Hill Hospital" (DEFTS038188); recorded Silver Hill as a central event in the Braverman matter (DEFTS038187); documented that Braverman-case experts were screened by whether they would "go against Silver Hill" (DEFTS035404–35405; ZNC035504); and included an affidavit of service identifying both matters on the face of one document (DEFTS033530). Plaintiff reported these contradictions to the Court by letter filed June 2, 2026, shortly after first obtaining the discovery materials revealing them.

72. The consequences of the withholding were not limited to delayed physical possession of documents. By withholding the records connecting the representations and revealing the Silver Hill trial-eve events, Defendants delayed Plaintiff's ability to identify the responsible attorneys and repositories; investigate and plead the concealed fiduciary breaches and other claims; challenge the asserted separation of the matters; seek discovery from the appropriate custodians; and evaluate whether the distinct acts, matters, insured attorneys, claims, and policy periods implicated separate claims, limits, coverage questions, or potential sources of recovery under the applicable policies — and, ultimately, required Plaintiff to commence this separate action to recover his own property and to present those questions at all. Plaintiff does not presently allege that any particular number of claims, policy periods, or limits necessarily applies; those questions depend upon policy language and coverage records controlled by Defendants. Plaintiff alleges that the withholding — and the resulting necessity of commencing and prosecuting this action to

recover his own property — deprived him of the information necessary to investigate, present, and timely adjudicate those questions.

73. Upon information and belief, a purpose of the continued withholding and resistance was to prevent or delay Plaintiff from demonstrating that the asserted unrelatedness position was contradicted by ZNC's own records and from developing the claims and coverage issues those records revealed. That inference rests on the documented relatedness position, the contents of the withheld records, the use of the position to narrow discovery, the continued withholding after specific notice, and the insurer-funded implementation of the conditions alleged above.

74. These conditions and refusals were not statements of arguable legal position as applied to this record. The presumptive right to the entire file — without document-by-document identification as a precondition of any production — is settled under *Sage Realty*, had been reiterated by this Court's April 21, 2026 Order days earlier, and is a matter squarely within the professional competence of a firm whose practice is the defense of lawyers. Returning a client's property is not a defense function: the conditions served no defensive purpose and operated only to prolong the deprivation.

**H. The Insurer Defendants: Notice, Practical Control, and Post-Notice Conduct**

75. Attorney Protective is ZNC's professional liability carrier for the matters at issue; Patrick is its President. Beginning no later than March 8, 2026, and continuing without interruption thereafter, Patrick personally received, at his individual email address, a sustained series of communications concerning Plaintiff's file: a March 8, 2026 notice captioned to the Related Action and policy exposure; service copies of discovery requests; the April 16, 2026 "Request for Complete Client File"; April 22–23, 2026 notices of ongoing exposure and opportunity to resolve; April 28–29, 2026 notices of this lawsuit and a litigation-hold notice; and May 6, 2026

communications addressed to Patrick, to MedPro's chief executive at his MedPro address, and to MedPro's legal compliance function.

76. Plaintiff's notices to the Insurer Defendants' leadership were specific to the file-retention conduct, not generic accusations of wrongdoing. Within the April-through-June 2026 notice period described above, Plaintiff emailed Patrick, President and chief executive of Attorney Protective, at scott.patrick@attorneyprotective.com, and Timothy Kenesey, MedPro's President and Chief Executive Officer, at tim.kenesey@medpro.com, stating in substance: that the client file was Plaintiff's property, owed by ZNC independently of any litigation; that the counsel appointed and financed under the Policy were delaying and conditioning its return; and demanding that Attorney Protective and MedPro stop funding the work directed at continued retention of the file — while remaining free to fund every legitimate defense of the claims on their merits. No recipient responded or disclaimed receipt; the engagement continued unchanged; and the conduct described in this Part, Part V.G, and Part V.I followed.

77. Plaintiff's tracking records reflect repeated retrieval of embedded tracking content associated with these communications across multiple devices over a period of months. Plaintiff does not rely on those records alone to establish that each recipient personally read each communication; they corroborate direct transmission to the identified addresses and are consistent with internal circulation within Attorney Protective and MedPro. Actual notice rests principally on the direct addressing, the repetition and formality of the communications, the copies to MedPro's senior leadership and legal compliance function, and the absence of any response disclaiming receipt.

78. The notice was eventually met not with a response but with a wall. On May 28, 2026, Plaintiff's email to Patrick at scott.patrick@attorneyprotective.com — reiterating his request

for “my full and complete client files with full metadata and original DOC and PDF files” — was rejected at Defendants’ email security gateway with the SMTP response “550 Administrative prohibition – envelope blocked.” On June 28, 2026, further emails to that address and to MedPro’s chief executive at tim.kenesey@medpro.com were rejected with the same response. The blocked messages were directed to the same addresses that had previously accepted Plaintiff’s communications concerning the client-file dispute and this litigation, deliveries corroborated as alleged above. Plaintiff does not allege which individual configured the block. Plaintiff alleges, upon information and belief and on the technical and circumstantial basis stated below, that the rejections resulted from a human-configured administrative policy implemented at or for Attorney Protective and MedPro. The basis is the rejection notices themselves and the surrounding circumstances: the notices bear the classification “Administrative prohibition,” a designation associated with administrator-configured policy rules rather than with automated spam, reputation, or technical filtering; the same rejection issued from the infrastructure of both affiliated companies, at attorneyprotective.com on May 28, 2026 and at medpro.com on June 28, 2026; and the rejected sender and addresses had previously accepted Plaintiff’s communications on the same subject. The identity of the person or persons who instructed or implemented the policy, and the date and terms of its configuration, are recorded, if anywhere, in Defendants’ exclusively controlled email-administration and system records. These facts are consistent with, and support the inference of, a decision to terminate further direct communications with Plaintiff while the challenged conduct continued. The identity and level — claim, supervisory, or corporate — of the person who authorized it are matters uniquely within Defendants’ knowledge and appropriate subjects of discovery.

79. The Insurer Defendants' notice was matched by substantial practical control over the litigation response. ZNC's coverage is a claims-made lawyers professional liability policy with limits of $5,000,000 per claim and in the aggregate (the "Policy"). Under the Policy: the insurer has the right and duty to defend and the exclusive right to select defense counsel, a right Attorney Protective exercised by appointing LBBS, including Yannucci and Cohen; by endorsement, the deductible applies only to damages, so the insurer bears the cost of the defense from the first dollar; claim expenses are limited to fees of counsel designated or approved by the insurer, whose determination as to their reasonableness is conclusive; and, by endorsement, the insured may not settle, incur claim expenses, enter tolling agreements, assume obligations, or admit liability without the insurer's prior written consent.

80. The Policy structure accordingly gave the Insurer Defendants substantial practical control over the litigation response — the selection and continued retention of defense counsel, the financing of the defense, authority over resolution of the covered claim, and — upon information and belief, based on the Policy's expense provisions, the first-dollar financing, the insurer-selected engagement, the continuation of the work after notice, and the exclusively controlled billing and reporting records — the review, approval, and payment of expenses attributable to the post-notice file-response work. Plaintiff does not allege that the Policy expressly barred ZNC from returning client records; he alleges that, in practice and under this structure, the response to Plaintiff's demands was conducted by counsel the Insurer Defendants selected, retained, and financed, and was subject to their authority.

81. After actual notice, the Insurer Defendants: continued to retain and finance the counsel who imposed and maintained the conditions described in Part V.G; did not require return of the undisputed portions of the client file; and continued to finance the defense of the withholding

through the July 8, 2026 production and beyond. These facts support the reasonable inference that the Insurer Defendants knowingly enabled, authorized, or ratified the continuing deprivation. Returning Plaintiff's property would not have admitted liability, waived any defense, or impaired the defense of any claim; at any time after notice, the Insurer Defendants could have required that Plaintiff's property be returned while contesting every substantive allegation. The continuation of the withholding after notice was a choice.

82. The client-file obligation existed independently of discovery, independently of this or any litigation, and independently of the merits of any malpractice claim — as this Court's April 21, 2026 Order recognized in treating the file right as standing apart from litigation discovery. Because surrender of the client file could have occurred at any time without conceding liability, waiving a defense, or affecting the merits of the Related Action, the continued expenditure of defense resources specifically to formulate, communicate, and maintain conditions on surrender served the continued retention itself rather than any necessary defense on the merits. From April 2026 forward, the response to Plaintiff's property demand was conducted through the counsel Attorney Protective selected and paid, within the funded engagement and subject to the contractual authority described above. Whether the Insurer Defendants expressly approved the particular file-return decisions is a matter within their claim file and appointed counsel's billing and reporting records; the chronology and conduct described — sustained formal notice, the specific conditions that followed within days of the April 21 Order, and the continuation of the funded work — permit the inference, at the pleading stage, that the file-retention work was undertaken within, and paid for through, the engagement the Insurer Defendants selected and financed. Their failure, after notice, to separate the property matter from the funded defense — by informing appointed counsel that the former client's property demand lay outside the insured defense so that the insured would

discharge its own obligation itself or through counsel of its own retention — is pleaded as corroboration of the affirmative conduct, not as a freestanding basis of liability.

83. Upon information and belief — based on Attorney Protective's own public materials describing it as a MedPro company, on Patrick's public biography describing his role in "starting up the division," and on the routing of Attorney Protective executives' email through MedPro's own medpro.com infrastructure — Attorney Protective operates as an integrated division of the MedPro organization rather than an arm's-length subsidiary, with MedPro personnel, systems, and functions participating in the claims operation through which this matter was handled. MedPro's alleged role accordingly rests not on corporate parenthood but on the participation of its own infrastructure and, upon information and belief, its own personnel in the claims function.

84. The Insurer Defendants' motive was immediate and case-specific: the Policy provides limits of up to $5,000,000 per claim, and Plaintiff's claims, as he enumerated them in the notices delivered directly to the Insurer Defendants, asserted distinct defaults and failures across multiple representations — the Braverman/PATH action, the Silver Hill matter, the Buch consolidation, and United States v. Teman — arising from multiple alleged incidents, in multiple courts and jurisdictions, across multiple policy years. The asserted scope was acknowledged by appointed counsel herself: during a telephonic conference with the Court in the Related Action, Yannucci acknowledged that Plaintiff had raised at least six distinct incidents, as Plaintiff, a participant in that conference, recalls from it. Whether those assertions constitute one claim or several, under one limit or several, is among the coverage questions alleged above that depend on policy language, related-claims provisions, and coverage records within Defendants' exclusive control; but the question itself defined the stakes — if more than one claim or limit applies, the

exposure multiplies accordingly — and the client file contained the principal evidence bearing on that exposure — including, as Parts V.B, V.C, and V.E establish, the documentary record of the Silver Hill trial-eve crisis, the undisclosed conflict, and the concealed Braverman default. Every month the file was withheld was a month of delay in the development of the claims against the Policy's limits. That structure supplied the incentive, alleged upon information and belief, for the course described in this Part and in Part V.G: to deny Plaintiff access to the file containing the principal evidence of the exposure, and to maintain before the Court the asserted unrelatedness position that the withheld records contradicted.

**I. The July 8, 2026 Production and the Continuing Deprivation**

85. On July 8, 2026 — after this action was commenced, and without any court order compelling production in this action — ZNC produced a portion of Plaintiff's client file: approximately 5,390 files totaling approximately 21.7 gigabytes, organized into client-file folders for the Braverman and Silver Hill matters, together with a small folder of email exports, delivered as encrypted archives with a load file, transmitted under cover of a 5:37 p.m. email from Cohen describing the production as "files maintained in the regular course of business by ZNC for its legal representation of you in the PATH/Braverman and Silver Hill litigations" and Bates numbered ZNC000001–ZNC094011.

86. The production is materially incomplete, on grounds that are observable and countable:

(a) It omits known correspondence that Plaintiff himself holds. None of the forty-three messages in the 2021–2024 email thread quoted in Part V.E appeared anywhere in the July 8 production. The July 17 supplemental production later delivered the May 10–15, 2023 tail of that thread (approximately twenty-eight documents, ZNC094313–ZNC094717) — while the 2021,

2022, and early-May 2023 portions, including the June 15, November 5, and November 9, 2022 messages and the May 9, 2023 disclosure email quoted in Part V.E, remain absent from both productions. The productions therefore cannot be complete as a matter of observable fact.

(b) It contains no messages in .msg, .eml, .pst, .ost, or .mbox format. Email content appears only in rendered or exported formats (1,514 .htm and 128 .mht files) that do not preserve all information ordinarily available from native messages, including complete transport headers, mailbox and folder information, parent-child relationships, and native attachment associations. The production itself demonstrates that ZNC mailboxes containing responsive correspondence existed and were not natively collected: at least two 2017 exchanges survive only as scanned printouts of messages from ZNC mailboxes (ZNC089167), while the native messages appear nowhere.

(c) Its correspondence record collapses after 2017: of 1,554 parsed emails, the production contains one dated 2014, 1,549 dated 2015 through 2017, and exactly two dated from January 2018 through December 2024 — an internal voicemail forward and a court e-filing receipt — and no client-facing email of any kind after 2017, across a representation that continued into 2023.

(d) The July 8 production contained no identified materials for the Buch matter and none for *United States v. Teman*, against the categories identified in the Related Action at ECF No. 114 (July 1, 2026). The July 17 supplemental production then delivered extensive Buch-matter records — the docket number 157336/2018 appears in at least seventy-five produced documents — establishing at once that ZNC maintained Buch-matter records, that counsel's June 22, 2026 assertion that ZNC "only provided" representation in two litigations and July 15, 2026 refusal to confirm the existence of Buch materials were contradicted by ZNC's own files, and that those

records were withheld from the July 8 client-file production. Records concerning *United States v. Teman* remain absent from both productions.

(e) It contains no collection from the personal email accounts used in the representation (Part V.A): prueher76@gmail.com returns zero occurrences across both productions, and jvirgil.znc@gmail.com, though appearing as a participant on twenty-four produced messages, was never collected as a repository. It contains no collection from Flood's systems or Prueher's subsequent repositories, notwithstanding that client-file materials were created and transmitted through Prueher's Flood address (Part V.B). And ZNC's document-management system ("mdoc") is referenced within the produced documents but was never exported or produced.

(f) It was accompanied by no representation identifying the custodians or repositories searched, whether the personal accounts used in the representation were collected, or whether the production was complete.

(g) Its email record contains truncated and partial threads: reply messages produced without the originating messages to which they respond — including Prueher's September 22, 2017 witness-assessment message from The Flood Law Firm to Virgil (ZNC097891; scanned printout at ZNC089167 p.83), produced without the originating request that prompted it: no earlier message in that thread appears anywhere in the production — and multi-page communications produced with pages missing. And the September–October 2017 settlement drafting sequence described in Part V.B appears in the production as documents without the counsel-to-counsel transmittal correspondence that necessarily accompanied their negotiation and exchange: drafts passed between ZNC and Danaher exist; the correspondence transmitting and discussing them does not.

87. On the basis of that pattern, Plaintiff alleges, upon information and belief, that correspondence between ZNC and Danaher concerning the Silver Hill matter and the October 2017

settlement exists and has been withheld — from the client file, to which correspondence with opposing counsel belongs as a matter of settled law regardless of matter, and from the productions described in this Part. The withheld category is precisely the correspondence that would document the coordination already reflected on the face of the executed terms: a drafted clause restricting reports to the Department of Public Health; a confidentiality provision binding Plaintiff's own lawyers — a term serving the mutual interests of Silver Hill and ZNC in silence, and no interest of Plaintiff's; and execution obtained on the scheduled trial date under the circumstances alleged in Part V.B. Plaintiff anticipates that a complete collection of ZNC's repositories, including through the neutral examination sought in the Prayer for Relief, will include this correspondence, and that any certification of complete production that omits it will be incomplete on its face.

88. The observable omissions, single-custodian limitations, missing periods, absent repositories, and degraded metadata alleged above support not only delivery and certification relief but, if ordinary discovery proves insufficient to verify the production, appointment of a neutral examiner under a Court-approved protocol to determine whether the relevant sources were preserved, collected, searched, and produced.

89. The production's incompleteness is acknowledged in counsel's own subsequent correspondence. On July 13, 2026, Yannucci wrote to Plaintiff that "non-privileged emails, email attachments, and outlook calendar notifications" "will be produced under separate cover" and "were not contained within defendants' initial discovery production." On July 15, 2026, Yannucci wrote that "a download link for the supplemental discovery documents will be available by July 17, 2026." Although framed as litigation-discovery supplementation in the Related Action, these statements are written admissions that native ZNC emails, attachments, and Outlook calendar records concerning Plaintiff's matters exist at ZNC and had not been produced — while the client-

file production delivered on July 8, 2026 contained not a single native email message. The July 15 letter also declined to confirm whether ZNC maintained client files for the Buch matter or for *United States v. Teman*, invoking the denial of a discovery motion in the Related Action — a discovery ruling that has no bearing on the property right at issue here.

90. On or about July 17, 2026 — nine days after the production held out as Plaintiff's client file "maintained in the regular course of business," and only after all three motions to dismiss had been filed in this action (ECF 43–44 on July 10; ECF 45–47 and 48–50 on July 17) — Defendants delivered a supplemental production, framed as discovery supplementation in the Related Action, containing native email messages: the first native email produced in any form across either track. The delivery of native email on July 17 establishes that native email existed at ZNC, was collectible, and was withheld from the July 8 client-file production — a production to which, under *Sage Realty* and counsel's own June 22, 2026 letter agreeing to produce "your entire client file in native format as maintained by ZNC in the ordinary course of business," it indisputably belonged.

91. The sequencing supports the inference of strategic timing rather than technical necessity. The natives ultimately produced on July 17 had been the subject of Plaintiff's demands for months and of counsel's written agreement since June 22; no technical obstacle to their earlier export has been identified; and the supplemental delivery was scheduled, per counsel's July 15 email, for "by July 17, 2026" — the same date the Law Firm Defendants and Danaher filed motions to dismiss asserting, among other things, that the July 8 production defeated Plaintiff's claims. Upon information and belief, the productions were staged so that the motions could be filed against a record from which the native repositories — and what they reveal — were still absent.

92. The supplemental production itself, examined forensically, documents its own limits. It is a single-custodian delta: its load file identifies the custodian as Virgil ("JCV") on 3,005 of 3,025 records, with no collection from Medina, Cooper, Prueher, or any other custodian. Within Virgil's own single-custodian production, not one document bears any 2021 or 2022 date — verified against both sent and received dates — across the very period of the Braverman default chronology pleaded in Part V.E, while Plaintiff's own archive proves that Virgil authored and received case emails throughout 2021 and 2022. And the produced "native" messages were delivered stripped of their RFC-822 threading headers — two Message-IDs survive across 3,011 messages — degrading the very authenticity and thread-reconstruction value that native production exists to provide. An email void spanning precisely the default period, in the mailbox of precisely the custodian who conducted the concealment, in a production stripped of the metadata that would permit reconstruction, states an observable pattern; whether it reflects selective collection, selective production, or destruction is a matter for discovery.

93. The eventual productions support the inference that substantial portions of the file were available for collection and delivery throughout the period of demands, and undermine the prior suggestions that Plaintiff was required to identify each document individually, or to pay, before receiving his file. The deprivation continues as to the omitted correspondence, the missing sides of collected threads, the mailbox data and calendar records not yet delivered, the Buch and criminal-matter materials, the personal-account materials, the Flood-system and successor-repository materials, and any additional files not yet delivered.

## VI. CLAIMS FOR RELIEF

### COUNT I — REPLEVIN

(Against ZNC, Virgil, Prueher, and Flood)

94. Plaintiff repeats and realleges the allegations of Parts I through V.B, V.D, V.F, V.G, and V.I.

95. Plaintiff has an immediate, superior possessory right to specifically identifiable property: his client file in every matter in which ZNC represented him as alleged herein, including the omitted correspondence, native email files and mailbox data, calendar and matter records, the Buch and criminal-matter materials, the materials residing in the personal email accounts used in the representation, and the client-file materials residing in Flood's systems and in Prueher's possession at any subsequent firm, including the September 22, 2017 witness memorandum and related work.

96. As to each defendant, the possessory basis is specific. ZNC and Virgil are the custodians of the file and withhold the unproduced categories identified in Part V.I notwithstanding the demands identified in Part V.F. Prueher created and transmitted client-file materials through his personal account (prueher76@gmail.com) and through Flood's systems, no collection from which appears in either production; he received Plaintiff's April 2026 client-file correspondence at jprueher@gouldinjurylaw.com and has delivered nothing. Flood's systems were the platform on which the September 22, 2017 witness memorandum was created and transmitted, and no collection from Flood appears in either production; upon information and belief those materials remain in Flood's possession, custody, or control. Plaintiff is entitled to an order directing delivery of that property as maintained — in native form where natively maintained, with metadata intact — subject only to any narrow, particularized exception under *Sage Realty*, as to which Defendants bear the burden of identification.

**COUNT II — CONVERSION**

(Against ZNC, Virgil, Prueher, and Flood)

97. Plaintiff repeats and realleges the allegations of Parts I through V.B, V.D, V.F, V.G, and V.I.

98. Plaintiff has a possessory right and interest in his client file. Defendants ZNC, Virgil, Prueher, and Flood have exercised, and continue to exercise, unauthorized dominion over that property to the exclusion of Plaintiff's rights: ZNC and Virgil by refusing demand after demand, imposing conditions inconsistent with New York law, and delivering a production that omits identified categories of Plaintiff's property; Prueher and Flood by retaining client-file materials without disclosure or delivery notwithstanding the termination of any role in the representation.

99. Demand and refusal are established defendant by defendant. As to ZNC and Virgil: the written demands beginning November 4, 2022, the formal April 16, 2026 demand, selective and partial transmissions, and continuing non-delivery of identified categories of property. As to Prueher: the April 16, 2026 demand was directed to former ZNC attorneys, and the April 23, 2026 correspondence concerning the demand was transmitted to him at jprueher@gouldinjurylaw.com; he has delivered nothing. As to Flood, whose original possession arose from Prueher's undisclosed transmission of client work through its systems: to the extent no earlier demand reached Flood, the filing and service of this action constitute demand, and continued non-delivery thereafter constitutes refusal; conversion as to Flood is pleaded from that date, and replevin under Count I independently of demand.

100. Subsequent partial or further delivery of the property does not retroactively eliminate the conversion completed by demand and wrongful refusal; under New York law the tort is complete upon the refusal, and later return bears on prospective relief, the duration of the deprivation, mitigation, and damages — not on liability.

101. As to the categories still withheld, the conversion is continuing: each day of retention after demand is a renewed exercise of dominion over Plaintiff's property, and the claim is timely as to all withheld categories without regard to the date of first refusal. As a direct and proximate result, Plaintiff has been damaged in concrete respects incurred before and apart from this action, including: the loss of possession, use, and control of identified records for the periods of deprivation alleged; out-of-pocket data-processing and storage costs occasioned by the form and volume of the eventual 21.7-gigabyte production; the pre-suit costs of reconstructing from Plaintiff's own archives the correspondence omitted from the production, including the forty-three-message thread identified in Part V.I; and work necessarily repeated because the underlying records were withheld — in amounts to be itemized and proven at trial.

**COUNT III — BREACH OF FIDUCIARY DUTY**

(Against ZNC, Virgil, Medina, Cooper, Prueher, and The Flood Law Firm, LLC)

102. Plaintiff repeats and realleges the allegations of Parts I through V. This Count is confined to breaches of the duties of loyalty, candor, disclosure, and property-return — self-interested conduct, concealment from the client, and unauthorized retention of the client's property. It does not plead, and does not depend upon, any claim that Defendants negligently prepared or prosecuted any matter; the state of preparation is pleaded as a concealed fact, not as a freestanding breach.

103. As Plaintiff's attorneys and as partners of the firm that represented him, ZNC, Virgil, Medina, Cooper, and Prueher owed Plaintiff duties of undivided loyalty, candor, and disclosure, including the duty to disclose conflicts of interest, together with the duty — which survives the termination of the representation — to return the client file upon demand, promptly and without unlawful conditions.

104. Throughout the representation, ZNC, Virgil, Medina, and Cooper breached the duty of undivided loyalty by maintaining, without disclosure or waiver, the conflict alleged in Part V.C — the firm's healthcare transactional interests in institutions related to and affiliated with Silver Hill — and by subordinating Plaintiff's interests to that conflict, including by failing to investigate and deploy the service-fraud evidence Plaintiff furnished (Part V.C), and by conducting and limiting the prosecution of Plaintiff's claims under the undisclosed institutional interest alleged in Part V.C.

105. In 2017, they further breached those duties by: concealing from Plaintiff the departure of his lead trial counsel weeks before trial; concealing Prueher's continued, undisclosed work on the case from another firm's systems; concealing from Plaintiff the state of the firm's trial preparation — a material fact bearing on his settlement decision — while Plaintiff pleaded in writing for partner attention; responding to the client's October 6 plea — of which Cooper and the partnership had written notice — with a same-session letter, motion to withdraw, and motion for continuance rather than with candor; subjecting Plaintiff to the trial-eve coercion alleged in Part V.B; presenting for execution, on the morning of trial, a settlement whose drafts contained a no-report term Plaintiff had rejected in writing and whose confidentiality clause bound Plaintiff's own lawyers; and failing to render to Plaintiff any true and accurate accounting of the settlement funds — the only located "Settlement Statement" (ZNC079386) being the unsigned, mis-assembled, and internally impossible document described in Part V.B, while ZNC retained $15,000 of the recited $40,000 recovery as its contingency fee — identified as such in ZNC's contemporaneous correspondence to Plaintiff, but a retention for which no signed fee agreement, closing statement, or itemization of rate, authorization, or costs appears in the produced file, which recites instead, in the template ZNC079386, a contradictory fee of $58,333.33. ZNC's own correspondence confirms

the proceeds reached its trust account — "The $ is in the trust account," December 8, 2017 (ZNC060583; native at ZNC105253–105254) — and ZNC's trust-account records remain unproduced. Prueher separately breached his continuing duties by working on the matter after his departure without disclosure, engagement, or waiver.

106. In 2022 and 2023, ZNC and Virgil breached those duties by concealing the 90-day notice, the unopposed dismissal motion, and the dismissal, as alleged in Part V.E, and by responding to Plaintiff's demands for the adverse record with selective transmissions.

107. From 2022 through the present, ZNC and Virgil breached the duty to return the file: by years of non-delivery, by the conditions described in Part V.G, and by the incomplete July 8, 2026 production described in Part V.I. Relatedly, ZNC breached the fiduciary duty to safeguard and maintain client property and confidences by maintaining Plaintiff's records commingled with other clients' confidential materials and scattered across uncollected repositories (Part V.B), a condition inconsistent with any reliable certification of the file's completeness. Subsequent partial or further delivery does not retroactively eliminate the breaches already completed; it bears on prospective relief, duration, mitigation, and damages.

108. The breaches alleged in this Count are not litigation conduct. The duties of loyalty, candor, and disclosure were owed to Plaintiff as client, and the duty to return the file arose upon termination of the representation and exists independently of any action; this Court has recognized that the right to the file stands apart from litigation-related discovery.

109. This Count is timely under New York law and, in the alternative, under Connecticut law, including Conn. Gen. Stat. § 52-595 (fraudulent concealment of a cause of action tolls limitations until discovery). What Plaintiff knew, and when, is pleaded with specificity: in 2017, Plaintiff knew that Prueher had departed and that he had been pressured into a settlement — but not

that Prueher had continued working the case from Flood, not the drafting metadata of the firm's exit papers, not the state of the trial-preparation file, and not the firm's conflicting institutional interests, all of which resided exclusively in the withheld file; in 2022–2023, Plaintiff received Virgil's lulling accounts and, in May 2023, the NYSCEF dismissal record — disclosing the dismissal but not the internal record of concealment, assembly, and non-communication that the file alone contains; the file was demanded repeatedly from 2022 forward and withheld until July 8, 2026, and reviewed on or about July 13, 2026. Ordinary diligence could not extract from Defendants what Defendants refused, upon repeated demand, to deliver; Defendants are equitably estopped from asserting limitations produced by that refusal; and the property-return breaches are continuing.

110. Prueher's fiduciary breaches include, in addition to the conduct alleged above: departing the representation on the eve of trial without notice to his client, without an orderly transition, and without ensuring the client was informed; and thereafter continuing to perform and direct substantive work on Plaintiff's matters from The Flood Law Firm without disclosure, without informed consent, and without any engagement — an undisclosed arrangement in which Plaintiff's confidential information and case decisions were placed in the hands of a firm with which Plaintiff had no relationship and which owed him no disclosed accountability. Flood is liable both vicariously, for Prueher's conduct undertaken with its systems, personnel, and resources, and directly: a law firm whose lawyer and systems undertake substantive work on a person's pending litigation assumes fiduciary obligations of disclosure and loyalty to that person, and, upon information and belief, Flood performed no conflicts check, opened no engagement, and made no disclosure of any kind to Plaintiff while its resources were used on his matters.

111. As a direct and proximate result, Plaintiff has been damaged, including the $15,000 contingency fee ZNC retained from the settlement, recoverable through the forfeiture and disgorgement remedy alleged above and to the extent it exceeded any lawful, agreed, and documented fee; the prolonged deprivation of his property, the delayed discovery of his claims, and the costs of recovery, in an amount to be determined at trial. Plaintiff further seeks, as a remedy for the breaches of loyalty alleged, forfeiture and disgorgement of the fees ZNC received for the disloyal representation, under New York's faithless-servant doctrine and equivalent Connecticut principles — including the amounts reflected in, and unreconciled by, the record described in Part V.B. Plaintiff does not seek in this Count any damages sought in the Related Action, and will not recover twice for any item of loss; the Related Action's malpractice claim concerns the Braverman/PATH matter, while this Count rests on loyalty, concealment, and property-retention conduct not pleaded there. As to Cooper specifically: in addition to his receipt of the October 6, 2017 plea for partner attention and his role in the partnership-level response, Cooper personally held the healthcare transactional interest from which the undisclosed conflict alleged in Part V.C arose; a fiduciary who personally holds an interest in tension with the client's representation owes the client disclosure of that interest, and Cooper made none. The conduct alleged was willful and warrants punitive damages.

**COUNT IV — FRAUD AND FRAUDULENT CONCEALMENT**

(Against ZNC, Virgil, Medina, and Prueher; against Flood vicariously)

112. Plaintiff repeats and realleges the allegations of Parts I through V.C and V.E through V.I.

113. As fiduciaries, ZNC, Virgil, Medina, and Prueher were under an affirmative duty to disclose material facts to Plaintiff. Their omissions and half-truths are actionable as fraud without regard to whether any statement was literally false in isolation.

114. In September and October 2017, Defendants concealed from Plaintiff material facts each knew: that his lead trial counsel had left the firm (concealed from September 18 until Plaintiff's own discovery on October 6); that Prueher was continuing to work on the case from Flood without engagement or disclosure; that the firm's trial preparation lacked the ordinary instruments of readiness; and that the firm labored under the undisclosed conflict alleged in Part V.C. Medina's October 8, 2017 letter — authored by Medina, edited by Virgil — responded to the client's discovery of the concealment without disclosing Prueher's continued involvement, the preparation record, or the conflict, while enclosing a continuance motion and accompanying a withdrawal motion prepared in the same session.

115. In justifiable reliance on his fiduciaries and in ignorance of the concealed facts, and under the coercive circumstances alleged in Part V.B, Plaintiff executed the October 11, 2017 settlement for $40,000 and received only $25,000 without any accounting. The damages Plaintiff seeks under this Count are confined to his independently provable losses from the concealment: the $15,000 contingency fee retained by ZNC, recoverable upon forfeiture and to the extent it exceeded any lawful, agreed, and documented fee; the out-of-pocket costs and losses of the delayed discovery and recovery of his property and claims; and interest as permitted by applicable law — together with the rescission-related relief pleaded in Count VI. Plaintiff does not seek in this Count the hypothetical value of any better litigation outcome. Had the concealed facts been disclosed, Plaintiff would not have executed the settlement on those terms.

116. In 2022 and 2023, ZNC and Virgil made the materially misleading statements quoted in Part V.E — the June 15, 2022 consolidation analysis silent as to the pending dismissal motion; the November 5, 2022 description of the pending motion as concerning "bankruptcy/insolvency filings"; the November 9, 2022 statement that the motion was "recent"; the May 9, 2023 description of the dismissal; the May 11, 2023 statement "Attached are the motions that I filed"; and the May 11–12, 2023 statement "This should have everything" — each a half-truth or omission by fiduciaries under a duty of full disclosure, made with knowledge of the concealed facts.

117. In justifiable reliance, Plaintiff refrained from protective action that remained available at the date of each communication. As of June 15, 2022, the dismissal motion, though past its return date, was not submitted until September 7, 2022 and not decided until April 12, 2023: disclosure would have permitted Plaintiff to engage counsel and to seek leave to serve late opposition. As of November 5 and 9, 2022, the motion remained undecided: disclosure would have permitted an application for leave to be heard before decision. As of May 9–12, 2023, disclosure of the true grounds would have permitted a prompt, fully informed motion to vacate under CPLR 5015 and an informed appeal; instead Plaintiff received a mischaracterization and, upon demand, only ZNC's own papers. At each date, the concealment deprived Plaintiff of a then-available corrective step, and injured him through the delay of protective action and of the discovery of his claims. The damages sought here for that injury are the delayed-discovery and recovery losses enumerated below — not the value of the Braverman action or any impairment of it, which are the subject of the Related Action.

118. Scienter is evidenced by, among other things: the contemporaneous documentary record of each concealed fact within Defendants' own files; the drafting metadata and single-

session assembly of the October 8, 2017 response; the April 2023 assembly of the dismissal record weeks before disclosure; counsel's own written acknowledgment that "none of them are willing to testify against Silver Hill" (ZNC035504) and the related record cited in Part V.C; and Defendants' direct professional and financial interests in concealment.

119. Flood is liable for Prueher's conduct within the scope of his association with Flood from on or about September 18, 2017, including the undisclosed September 22, 2017 work on Plaintiff's matter transmitted through Flood's systems.

120. This claim is timely under New York law — within two years of actual discovery under CPLR 213(8), applied with CPLR 202 to the extent the borrowing statute governs — and, in the alternative, under Connecticut law, including Conn. Gen. Stat. § 52-595. The knowledge chronology pleaded in Count III is incorporated: the concealed facts resided within the client file that Defendants withheld against repeated demand; the record was first produced on July 8, 2026 and first reviewed by Plaintiff on or about July 13, 2026; and Defendants are equitably estopped from asserting limitations, because the delay in discovery was produced by their own affirmative concealment and by the withholding of the very records that reveal the fraud. Plaintiff will not recover in this Count any item of damages awarded in the Related Action.

121. As a direct and proximate result, Plaintiff has been damaged in an amount to be determined at trial, confined to the following independently provable losses: the $15,000 contingency fee retained by ZNC from the fraudulently procured release — recoverable upon forfeiture, and to the extent it exceeded any lawful, agreed, and documented fee, no signed fee agreement or closing statement appearing in the produced file; the out-of-pocket costs of the delayed discovery and recovery of his property and claims, as itemized in Count II; and interest as permitted by applicable law. Plaintiff does not seek in this action the value of the Braverman action

or damages for its impairment, which are the subject of the Related Action; the concealed dismissal is pleaded here as the object of the concealment and for reliance, scienter, and tolling purposes. The conduct alleged was intentional and morally culpable, warranting punitive damages.

## COUNT V — FRAUD, DURESS, AND UNCONSCIONABLE PROCUREMENT OF SETTLEMENT AND RELEASE

(Against Silver Hill and Danaher)

122. Plaintiff repeats and realleges the allegations of Parts I through V.C and V.I.

123. Silver Hill and Danaher procured the October 11, 2017 settlement and the general release it contains through fraud, duress, and unconscionable means, including: (i) pressing for execution on the morning of trial with knowledge of Plaintiff's abandonment that is alleged upon information and belief on the following stated basis: ZNC's October 8, 2017 Motion to Withdraw Appearance (ZNC077670) and Motion for Continuance (ZNC077659) bear certification-of-service forms addressed to counsel of record, and, upon information and belief, in accordance with Connecticut Practice Book certification requirements and service practice for appearing counsel, those motions were served upon Silver Hill's counsel upon filing — from which it is a reasonable inference, pleaded as such, that Silver Hill and Danaher knew, before extracting execution, that Plaintiff faced trial with counsel who had moved to withdraw and whose lead trial lawyer had left; knowledge of the counterparty's duress and incapacity, coupled with exploitation of it to extract a release below the cost to Silver Hill of simply trying the case, renders the resulting agreement voidable as against the knowing beneficiary — Danaher's conduct being pleaded as that of Silver Hill's agent in the procurement, with the relief sought against Danaher under this Count and Count VI confined to declaratory and rescission-related relief and costs, not damages for advocacy; (ii) demanding suppression terms, including draft language barring Plaintiff and his attorneys from

volunteering information to the Connecticut Department of Public Health and a demand that Plaintiff remove a claim of unlawful touching, directed at concealing conduct subject to oversight by, and reporting duties to, the Connecticut Department of Public Health; and (iii) concealing, while extracting a general release in their own favor, their own practice — evidenced by the marshal recording described in Part V.C — of procuring default judgments through service at addresses known to be bad, a practice whose exposure would have materially altered the settlement value and posture of the litigation and the parties' relative leverage.

124. Plaintiff executed the settlement and release under the duress alleged in Part V.B — sleepless, coerced, abandoned by unprepared and conflicted counsel on the morning of trial — and in ignorance of the concealed facts. The consideration recited was $40,000; Plaintiff received $25,000; and the release extinguished, among other things, Plaintiff's claims that he had been unlawfully confined at Silver Hill and — in a second, separately pending action naming Dr. Irwin Gelman — his claim of unlawful touching by Silver Hill's own psychiatrist while Plaintiff was a patient in the hospital's custody, as Plaintiff alleged in that pending pleading and alleges here from personal knowledge. Those allegations were never adjudicated: the release extinguished them before any court heard them.

125. As to timeliness, Plaintiff pleads candidly what he knew and did not know. In 2017 Plaintiff knew the circumstances he personally experienced: the departure of his lead trial lawyer, his own exhaustion and the pressure upon him, his counsel's motion to withdraw, the proposed and rejected no-report term, the demand to remove the unlawful-touching allegation, the confidentiality provisions of the executed agreement, and the timing of execution. What Plaintiff did not know, and could not with reasonable diligence have confirmed, was the element of this Count that runs against the settling counterparty rather than his own attorneys: documentary

confirmation that Silver Hill's side possessed knowledge of his abandonment before extracting execution — the October 8, 2017 motions, their certification-of-service forms, and the service sequence — which resided within the client file that ZNC withheld until July 8, 2026 and Plaintiff first reviewed on or about July 13, 2026. The affirmative claim is brought within two years of that discovery, CPLR 213(8), and within any period as tolled by Connecticut General Statutes § 52-595 as against parties whose conduct contributed to the concealment. In the alternative, and independently, the invalidity of the release is asserted defensively: Silver Hill and Danaher placed the release before this Court as a defense on June 4, 2026 (ECF 47), and Count VI responds to that invocation.

126. Silver Hill's negotiation conduct corroborates the materiality of the matters Plaintiff alleges were suppressed. Settlement drafts sought to restrict voluntary reporting to the Connecticut Department of Public Health (ZNC079324, ZNC079332); Plaintiff recalls a demand to remove the unlawful-touching allegation from his pleading; the executed agreement imposed confidentiality obligations extending to Plaintiff's own attorneys; and execution was obtained on the scheduled trial date, with the counterparty's knowledge of Plaintiff's circumstances alleged above. Plaintiff alleges that these terms and circumstances are relevant to whether the release was procured through fraud, duress, overreaching, or unconscionable means, and whether it should be rescinded or declared unenforceable. Plaintiff does not rely upon those terms as proof of any particular hypothetical settlement value. Plaintiff seeks the remedies identified in this Count and Count VI, with interest only from the date and at the rate permitted by applicable law.

## COUNT VI — RESCISSION AND DECLARATORY JUDGMENT THAT THE OCTOBER 11, 2017 RELEASE IS VOIDABLE

(Against Silver Hill and Danaher; 28 U.S.C. §§ 2201–2202)

127. Plaintiff repeats and realleges the allegations of Parts I through V.C and V.I and Count V.

128. An actual and justiciable controversy exists between Plaintiff, on the one hand, and Silver Hill and Danaher, on the other, concerning the validity and enforceability of the October 11, 2017 settlement agreement and the general release it contains, which Danaher has invoked in this action as a bar to Plaintiff's claims (ECF 47).

129. Under New York and Connecticut law alike, a release procured by fraud, duress, or overreaching is voidable at the election of the releasor. The release here was procured under the circumstances alleged in Parts V.B and V.C and Count V: concealment by Plaintiff's own fiduciaries of facts that Silver Hill's side knew or exploited; physical and psychological duress on the eve and morning of trial; suppression-term demands contrary to public policy; and concealment of the releasees' own service-and-default practices while a general release in their favor was extracted.

130. Timeliness as to this Count rests on independent grounds. Danaher has invoked the release in this District as a bar to Plaintiff's claims (ECF 47); a release's validity may be contested whenever and wherever it is asserted, and to the extent this Count responds to that invocation it is defensive in character and subject to no limitations bar. Independently, Plaintiff's repudiation is prompt as measured from discovery: the facts establishing procurement resided in the client file withheld until July 8, 2026, were first reviewed on or about July 13, 2026, and this Count was pleaded within weeks. Plaintiff elects to rescind the release as against Silver Hill and Danaher; offers to restore, credit, or offset the consideration he received, as the Court may direct under the governing law's tender rules or any recognized exception; and alleges that no conduct of his

between execution and discovery constituted ratification, because a party cannot ratify a release whose procurement was concealed from him.

131. Plaintiff is entitled to a judgment declaring the October 11, 2017 release voidable and rescinded as against Silver Hill and Danaher, or, in the alternative, declaring that the release is unenforceable as a bar to claims arising from the fraud, duress, and concealment by which it was procured, and to such further relief as is proper under 28 U.S.C. § 2202.

## COUNT VII — AIDING AND ABETTING CONVERSION AND BREACH OF FIDUCIARY DUTY

(Against Attorney Protective, MedPro, and Patrick)

132. Plaintiff repeats and realleges the allegations of Parts I through III and V.D and V.F through V.I, and Counts II and III.

133. ZNC and Virgil breached the fiduciary duties alleged in Count III, including the continuing duty to return Plaintiff's file.

134. The Insurer Defendants had actual knowledge of the duty and of its ongoing breach. From no later than March 8, 2026, Patrick personally, and from no later than May 6, 2026, MedPro's senior leadership and legal compliance function, received the direct, repeated, and formal communications described in Part V.H, setting out the demand, the governing law, and this Court's April 21 Order confirming the right.

135. After that notice, the Insurer Defendants provided knowing and substantial assistance to the continuing breach through specific conduct: they continued to retain and finance, from the first dollar, the appointed counsel who imposed and maintained the written conditions described in Part V.G; they did not require the return of the undisputed portions of the file; upon information and belief they continued to review, approve, and pay the expenses attributable to the

post-notice file-response work through which the refusal was maintained; and the withholding continued through and beyond the July 8, 2026 production, whose form and omissions are described in Part V.I. They are not alleged to be liable for insuring ZNC, for appointing defense counsel, or for funding a defense of the malpractice claims. The elements are pleaded distinctly. Actual knowledge: the notices identified in Part V.H, addressed and delivered on the dates alleged, set out the demand, the identified missing property, the governing law, and this Court's April 21, 2026 Order; no recipient disclaimed receipt. Nor can knowledge of the underlying obligation plausibly be disclaimed: the Insurer Defendants are specialists in lawyers professional liability, whose claims organization adjudicates attorney-conduct standards as its ordinary business, and the duty of a law firm to surrender a former client's file upon demand — the rule of Rule 1.16(d) and *Sage Realty* — is among the most elementary of those standards. Substantial assistance: because the client-file obligation existed independently of the defense, once the Insurer Defendants knew that ZNC was refusing an unequivocal demand for identifiable client-file materials, the work of formulating, communicating, and maintaining conditions on surrender — and of assembling and transmitting the productions in the form delivered — served the continued retention itself rather than any necessary defense on the merits; that work was performed within the engagement Attorney Protective selected and financed, and, upon information and belief and as reflected in records within Defendants' exclusive possession (the claim file, billing, and reporting records), was funded and permitted to proceed after notice. Inaction — the failure to require return of undisputed materials, the failure to separate the property matter from the funded defense, and silence in response to the notices — is pleaded as corroboration of the foregoing, not as a freestanding basis of liability. The continued engagement and financing materially facilitated and prolonged the challenged conduct by supplying, sustaining, and paying the counsel through whom

the conditions, exclusions, and productions were communicated and implemented. The substantial assistance alleged is thus not merely the continued provision of a defense after accusations against an insured: the counsel Attorney Protective selected and financed described the challenged course as an established method — "This is how we do this"; "We have done this for years" (as attributed in Part V.G) — and implemented that method through the written conditions, categorical exclusions, and partial productions alleged above. Plaintiff's notices identified the specific continuing breach and distinguished it from the covered malpractice defense; Attorney Protective nevertheless continued the particular engagement through which the independent property demand was resisted and, upon information and belief based on the Policy's expense-approval and reporting provisions, reviewed and paid expenses attributable to that post-notice work. The sequence is itself probative: counsel described the established course on March 24, 2026; Plaintiff's executive notices followed from April 22 through June 2026; and the implementation — the April 23 and June 22, 2026 conditions and the July 8 and July 17, 2026 productions — continued after each notice. The combination of direct notice, counsel's express description of the course, its subsequent implementation, and continued insurer-approved funding supports a reasonable inference of knowing substantial assistance. Nor was the assistance justified by any economic or contractual interest of the Insurer Defendants: an insurer's legitimate interest extends to defending covered claims on their merits, and whatever protection attaches to funding a defense does not attach to financing the obstruction of a former client's property right that existed, as this Court's April 21, 2026 Order reflects, independently of any claim, any defense, and any litigation. ZNC's obligation to surrender the file could be discharged at any moment without impairing any covered defense; funding its continued breach served no insurable interest at all. The affirmative rejection of further communications through Defendants' email infrastructure as described in Part

V.H, coupled with continued financing of the specific conduct after notice, supports the same inference.

136. The same notice and the same funded implementation also aided the conversion alleged in Count II — an underlying property tort requiring no fiduciary characterization: the notices described Plaintiff's ownership of the file and ZNC's continued exclusion of him from it, and the financed work was the instrument by which that exclusion was maintained. The allegations establishing ZNC's and Virgil's underlying conversion in Count II are incorporated solely as the predicate tort for the aiding-and-abetting claim against the Insurer Defendants; Plaintiff does not assert direct conversion against the Insurer Defendants. Plaintiff's notices identified the property, his claimed immediate possessory right, his repeated demands, and ZNC's continued withholding; the post-notice conduct alleged above supports the reasonable inference that the Insurer Defendants knowingly assisted continuation of that withholding. The foreseeable effect — and, upon information and belief for the reasons alleged in Part V.G, a purpose — of the post-notice assistance was to prolong not only Plaintiff's deprivation of the file, but also his inability to use that property to demonstrate the relationship among the representations, identify the responsible actors and repositories, obtain appropriately targeted discovery, and investigate the claims and potential coverage consequences revealed by the file. Those consequences are pleaded as evidence of motive, causation, duration, and the seriousness of the deprivation. As damages against the Insurer Defendants, Plaintiff seeks only the concrete post-notice losses legally attributable to their assistance — including loss of use and possession and itemized pre-suit recovery, reconstruction, processing, and storage expenses — and does not seek from them in this Count the underlying value of the Silver Hill or Braverman malpractice claims.

137. *See Kaufman v. Cohen*, 307 A.D.2d 113, 125–26 (1st Dep't 2003). The withholding of a former client's file is not defense strategy; it is an independent, continuing breach of fiduciary duty. Returning the property would not have admitted liability, waived any defense, or impaired the defense of any claim.

138. Patrick received the communications directly and personally at his individual address, repeatedly and formally, over a period of months; as President and chief executive — and, upon information and belief based on his public professional biography, among Attorney Protective's first employees, having helped lead the division since its founding — he held authority over the claims-handling function within which the file-response decisions were made; the escalations were addressed to him precisely because they demanded action within that authority; the specific conditions of April 23, 2026 issued within days of the April 21 Order, from the counsel whose retention and expenses lay within that authority; and appointed counsel herself copied Patrick on the April 23, 2026 client-file communication — counsel's own routing placing him within the decision loop for the very subject at issue (Part V.G). Whether Patrick personally made, approved, or supervised the particular file-return decisions is a fact peculiarly within Defendants' knowledge — recorded, if anywhere, in Attorney Protective's claim file and counsel's reporting — and on that basis is alleged upon information and belief: the sustained President-level escalation, followed by the continuation of the specific conduct and by the rejection of Plaintiff's further emails, permits the inference at the pleading stage that decisions of this nature received or required his authorization.

139. The three Insurer Defendants are pleaded separately, not collectively: Attorney Protective on its claims-handling authority and appointment, financing, and retention of the counsel maintaining the refusal; Patrick on his personal receipt of the notices, his supervisory

authority as President over the claims decisions at issue, and the continuation of the specific conduct thereafter; and MedPro not on corporate parenthood but on the direct notice to its chief executive and legal compliance function on May 6, 2026, followed by no corrective action and by an act at MedPro's own infrastructure: the June 28, 2026 rejection of Plaintiff's communications at the medpro.com domain — MedPro's mail systems, not Attorney Protective's — pleaded as alleged in Part V.H, with the operative facts of its configuration within MedPro's exclusive knowledge; on the integrated-division structure alleged in Part V.H, through which, upon information and belief, MedPro's own personnel and systems participate in the claims function; and on appointed counsel's own routing of the April 23, 2026 client-file communication to MedPro's chief executive and compliance functions — corroboration, from counsel herself, that MedPro sat within the decision structure for the file response (Part V.G). Subsequent delivery of portions of the property does not retroactively eliminate the assistance rendered to the breaches already completed. As a direct and proximate result, Plaintiff has been damaged by the continued deprivation of his property from the date of notice forward and the pre-suit costs of recovery identified in Count II, in an amount to be determined at trial. The conduct alleged — the continuation of specific assistance after repeated, specific, executive-level notice, in implementation of a course appointed counsel described as established — was willful and in conscious disregard of Plaintiff's rights, and warrants punitive damages.

## COUNT VIII — AIDING AND ABETTING CONVERSION AND BREACH OF FIDUCIARY DUTY

(Against Yannucci, Cohen, and LBBS)

140. Plaintiff repeats and realleges the allegations of Parts I through III and V.D, V.F, V.G, and V.I.

141. Yannucci and Cohen had actual knowledge of Plaintiff's presumptive right to his file and of ZNC's continuing withholding: the right is settled law squarely within the professional competence of a defense firm for lawyers; this Court's April 21, 2026 Order had confirmed it; and Plaintiff's April 16, 2026 demand and subsequent correspondence set it out expressly.

142. With that knowledge, they provided substantial assistance to the conversion and fiduciary breach through affirmative acts: authoring and transmitting the written conditions described in Part V.G — that Plaintiff identify his documents and that payment "will be required" to receive his own property; asserting the position that ZNC represented Plaintiff in only two litigations and refusing on that basis the Buch and criminal-matter files; and transmitting the July 8, 2026 production and describing its scope in the correspondence quoted in Part V.I, while the categories identified in Part V.I remained undelivered.

143. These acts are alleged not as advocacy, argument, or the assertion of legal positions in litigation, but as affirmative participation in the retention of a client's property. The return of a former client's file is not a defense function: it stands outside the defense of the claims against their clients, serves no defensive purpose to withhold, and — as this Court's April 21, 2026 Order reflects — exists independently of litigation discovery. Yannucci and Cohen did not merely defend against damages claims in court. They became the persons through whom ZNC responded to the extrajudicial property demand: they authored and transmitted the stated conditions, asserted the categorical exclusion of specified matters on an account of the representation contradicted by the record, communicated the operative scope of the production, and transmitted the production itself. Whether they also directed the underlying collection and production decisions — vendor instructions, custodian selection, production specifications — is recorded, if anywhere, in their own and their clients' files, and is alleged upon information and belief from the conduct pleaded,

which permits that inference at the pleading stage. The substantial assistance, moreover, is not inferred solely from counsel's authorship of correspondence. In the meet-and-confer described in Part V.G — in response to Plaintiff's statement that the client file was owed independently of litigation — as alleged in Part V.G, one of Yannucci or Cohen stated to Plaintiff, in the other's presence and in response to Plaintiff's statement that the client file was owed independently of litigation, "This is how we do this" and "We have done this for years" — describing as an established course the delay, conditioning, and litigation-routing of the client-file demand — and both Yannucci and Cohen thereafter participated in implementing that stated course through the April 23 and June 22, 2026 communications and the July 8 and July 17, 2026 productions. The statements and both attorneys' subsequent affirmative implementation — not either attorney's silence — evidence intent, knowledge, and absence of mistake or accident, and support punitive culpability. This Count does not seek to hold Yannucci, Cohen, or LBBS liable for any statement to any court or for the defense of their clients on the merits.

144. The foreseeable effect — and, upon information and belief based on the statements and subsequent conduct alleged above, a purpose — of Yannucci's, Cohen's, and LBBS's participation was to prolong Plaintiff's inability to use his property to challenge the asserted separation of the matters, identify the relevant custodians and repositories, and investigate the claims and potential coverage issues revealed by the file. Plaintiff pleads those consequences as evidence of motive, causation, and duration. The damages sought under this Count remain confined to the concrete post-April 2026 deprivation and recovery losses alleged herein, not the underlying value of any malpractice claim.

145. LBBS is liable for the conduct of Yannucci and Cohen alleged in this Count under principles of respondeat superior, as their acts were performed within the scope of their

employment and of LBBS's engagement, and LBBS received and retained the fees financing that conduct.

146. Subsequent delivery of portions of the property does not retroactively eliminate the assistance rendered to the breaches already completed. As a direct and proximate result, the deprivation of Plaintiff's property was prolonged from April 2026 forward, and Plaintiff incurred the pre-suit recovery costs identified in Count II, in an amount to be determined at trial. The conduct was willful and warrants punitive damages.

**COUNT IX — RACKETEERING, 18 U.S.C. § 1962(c)**

(Against ZNC and Virgil)

147. Plaintiff repeats and realleges the allegations of Parts I through III, V.D through V.I.

148. ZNC and Virgil are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

149. At all relevant times there existed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"), comprising ZNC, Virgil, and the ZNC personnel through whom the scheme alleged below was executed, functioning as a continuing unit. The Enterprise's common purpose exceeded the conduct of any one member's ordinary affairs: to conceal from Plaintiff his attorneys' defaults and the documentary record demonstrating them, and to withhold Plaintiff's client file containing that record. Its members were connected by defined relationships — the firm, its shareholder-officers, and its associates and staff, with custody of the file at the center — and it functioned over a period sufficient to pursue its purpose, from no later than June 2022 through the present. The Enterprise engaged in and affected interstate commerce. No defendant or person other than those named in this Count is alleged to have been a member of the Enterprise or to have committed or agreed to any act of racketeering.

150. The Enterprise consisted throughout of the association in fact of Virgil, ZNC, and the ZNC personnel through whom the scheme was executed — including Medina (copied on the May 15, 2023 communication) and associate Kyle Souza (the September 2022 objection drafting and April 2023 appeal drafting described in Part V.E) — functioning as a unit with the common purpose alleged above. Each RICO person is distinct from the Enterprise: Virgil, a natural person, is distinct from the association and, in the alternative as to Virgil, ZNC itself — a corporation legally distinct from its employee — is the enterprise whose affairs Virgil conducted through the pattern alleged. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). ZNC, as person, conducted the affairs of the broader association rather than merely its own: Virgil authored the wire communications alleged below and served as custodian of the file; ZNC's partners, associates, and systems executed the concealment and the withholding.

151. From no later than June 2022 through the present, ZNC and Virgil devised and carried out a scheme whose object was property: to obtain and maintain, as against their client and by deception, exclusive possession and control of Plaintiff's documents, records, and client file — property in which Plaintiff held an immediate possessory right and which Defendants' own governing law obligated them to deliver on demand. Possession lawfully acquired became retention by fraud when demand was made and Defendants procured continued possession not by asserting a right but by deception: each communication alleged below was calculated to prevent the demand from ripening into recovery — by concealing that there was a record to demand, by mischaracterizing what existed, and by falsely conveying that everything had been delivered.

152. In furtherance of the scheme, Virgil transmitted, by interstate wire between Connecticut and Plaintiff, each of the following communications, each in violation of 18 U.S.C. § 1343:

(a) June 15, 2022 (Virgil to Plaintiff, email): a substantive analysis of consolidating the Braverman and Buch cases, transmitted six days after the return date of the pending dismissal motion, omitting the motion and the unanswered 90-day notice — facts Virgil knew and was under a fiduciary duty to disclose, whose concealment was material to Plaintiff's decisions and lulled Plaintiff from protective action;

(b) November 5, 2022 (Virgil to Plaintiff, email): "There's a motion pending with the court where the court has to decide whether it will let this case proceed forward despite the bankruptcy/insolvency filings of one of the insurance carriers. I don't have a timeline on when/if it'll be ruled on" — a half-truth describing ZNC's own untimely cross-motion while concealing that the motion pending and fully submitted, without opposition, was the defendants' dismissal motion;

(c) November 9, 2022 (Virgil to Plaintiff, email): "The court has the motion. It's recent. It's already there for them to decide" — describing as "recent" a motion filed six months earlier and submitted unopposed two months earlier;

(d) May 9, 2023 (Virgil to Plaintiff, email): "Rather than grant my request for leave from the stay to do discovery the court just dismissed the case. I have filed an appeal" — omitting that the dismissal was for failure to prosecute, on an unopposed motion, after an unanswered 90-day notice, and that ZNC had known since at least April 14;

(e) May 11, 2023 (Virgil to Plaintiff, email): "Attached are the motions that I filed" — a selective transmission of ZNC's own untimely papers in response to Plaintiff's demands for the adverse record;

(f) May 11–12, 2023 (Virgil to Plaintiff, email transmitting "Teman Filings.zip"): "This should have everything" — a lulling transmission completing more than a year of

concealment, made only after Plaintiff's written statement that he would seek malpractice counsel; and

(g) The 2026 wire communications and transmissions concerning the file described in Parts V.G and V.I are not pleaded as predicate acts; they are pleaded as evidence of the scheme's continuation and concealment and of the continued deprivation of Plaintiff's property.

153. Each communication was made knowingly and with intent to conceal, to lull, and to prolong the deprivation; each advanced the scheme by forestalling Plaintiff's protective action and his recovery of his property; and each deprived Plaintiff, for its duration, of possession and control of identifiable records to which he held an immediate possessory right. The property linkage is predicate-specific. Predicates (a) through (d) concealed the very existence, nature, and location of identifiable records within Plaintiff's file — the 90-day notice ZNC had signed for, the dismissal motion, the unopposed submission, and the dismissal record assembled at ZNC by April 17, 2023 — and a client cannot demand records whose existence his fiduciary conceals from him: the deception prevented the demand from forming, and thereby maintained Defendants' exclusive possession. Predicates (e) and (f) responded to actual, pending demands — Plaintiff's May 10–12, 2023 demands for the adverse record — with deceptive partial delivery and the false assurance of completeness ("This should have everything"), procuring Plaintiff's forbearance from further recovery efforts and continued exclusive possession of the withheld remainder. The object at each step was possession of property, not the abstract avoidance of liability: the records themselves were the thing retained.

154. The predicate acts are not litigation activities. Each predicate — (a) through (f) — predates the Related Action (commenced December 2024) and this action by one to two and one-half years; each was directed to Plaintiff as ZNC's own client, not to any court or adversary; each

occurred in no proceeding between these parties; and each is an attorney-client communication, not a filing or advocacy.

155. The predicate acts constitute a pattern of racketeering activity, 18 U.S.C. §§ 1961(1), (5). They are related — same purpose, same participants, same victim, same methods. Continuity is pleaded candidly on the record as it stands. The pleaded predicates span June 2022 through May 2023. Plaintiff's primary theory is open-ended continuity: at the time of each predicate, the scheme by its nature threatened to continue indefinitely, because its object — exclusive possession of Plaintiff's records — persisted automatically until surrender, and the conduct that followed confirms the threat was real: the retention in fact continued for more than three further years, through the refusals and conditions of 2026, the July 8, 2026 production omitting identified categories, the staged July 17, 2026 supplemental delivery, and the categories that remain withheld today. In the alternative, the predicates satisfy closed-ended continuity in combination with the scheme's distinct phases and distinct property categories; Plaintiff acknowledges that the predicate span standing alone is under one year, and relies on the open-ended theory in the first instance.

156. Plaintiff was injured in his property by reason of the violations, in concrete and quantifiable respects: the loss of possession, use, and control of identifiable records in which he held an immediate possessory right, for the period of the deprivation; itemizable out-of-pocket costs of recovery incurred before and apart from this action, including data-processing and storage costs for the 21.7-gigabyte production and the costs of reconstructing from his own archives the correspondence omitted from the production. The delayed discovery of his claims is pleaded as a consequence of the scheme and in support of tolling, not as a standalone RICO injury. These injuries flow directly from the scheme and not derivatively through any third party.

157. By reason of the foregoing, ZNC and Virgil violated 18 U.S.C. § 1962(c), and Plaintiff is entitled to threefold damages and costs pursuant to 18 U.S.C. § 1964(c).

**COUNT X — RACKETEERING CONSPIRACY, 18 U.S.C. § 1962(d)**

(Against ZNC and Virgil)

158. Plaintiff repeats and realleges the allegations of Parts I through III and V.D through V.I, and Count IX.

159. ZNC and Virgil each agreed to conduct the Enterprise's affairs through the pattern alleged in Count IX, as evidenced by their own commission of the predicate acts and their coordination through the firm's personnel and systems.

160. The agreement is evidenced by the coordinated, sustained character of the scheme itself: a common plan executed across four years through the same firm, the same custodian, the same concealment methods, and the same property object, in which each participant's acts — Virgil's authorship of the predicate communications, and ZNC's execution of the concealment, assembly, withholding, and conditioned productions through its partners, associates, personnel, and systems — depended upon and furthered the other's. A conspirator need not commit or agree to commit predicate acts personally; it suffices that each knowingly agreed to further a scheme whose object and methods were known to it.

161. Plaintiff was injured in his property by reason of the conspiracy, as alleged in Count IX, and is entitled to threefold damages and costs pursuant to 18 U.S.C. § 1964(c).

**COUNT XI — EQUITABLE ACCOUNTING**

(Against ZNC and Virgil)

162. Plaintiff repeats and realleges the foregoing allegations concerning the October 2017 settlement and its accounting, including Parts V.B and V.I, as if fully set forth herein.

163. ZNC received and controlled the proceeds of the October 11, 2017 settlement in a fiduciary capacity for Plaintiff. Virgil was counsel of record and a shareholder of ZNC who directed the representation and personally participated in the settlement process: after Prueher's departure, it was Virgil who conducted and concluded the settlement with Plaintiff on October 10 and 11, 2017, as Plaintiff knows from his own participation in those events. Upon information and belief, based on that role and participation, Virgil participated in or supervised the receipt, application, disbursement, or accounting of the settlement proceeds; the precise allocation of responsibility is reflected, if anywhere, in ZNC's exclusively controlled trust, billing, settlement, and partnership records. The settlement recites consideration of $40,000; Plaintiff received $25,000. The sole located "Settlement Statement," ZNC079386, is unsigned, describes an unrelated matter's injury, recites a $58,333.33 fee exceeding the $40,000 settlement, and states a "net due client" that is mathematically impossible on its face; it reconciles nothing — not the consideration received, the endorsements, the fees, the disbursements, nor the amount transmitted to Plaintiff (Part V.B).

164. ZNC's own correspondence confirms the proceeds reached its trust account: "The $ is in the trust account," December 8, 2017 (ZNC060583; native at ZNC105253–105254). Despite Plaintiff's demands, Defendants have never rendered a complete and accurate accounting, and have not produced the trust-account ledger, deposit and disbursement records, settlement instruments, endorsements, fee authorizations, or other records necessary to reconcile the funds. Those records concern property entrusted to Defendants in a fiduciary capacity, are within their exclusive possession or control, and cannot be reconstructed from the defective settlement statement or from Plaintiff's own records. Monetary damages calculated without that accounting

would not identify what was received, authorized, deducted, transferred, or retained, and therefore would not provide an adequate remedy.

165. Plaintiff is entitled to a complete, sworn accounting identifying all settlement proceeds received; the account into which they were deposited; every transfer, fee, disbursement, and deduction; every endorsement or authorization; the recipient of each payment; and the basis, authorization, and computation of the $15,000 ZNC retained as its contingency fee — for which no signed fee agreement, closing statement, or itemization appears in the produced file, and which conflicts with the $58,333.33 fee recited by the template ZNC079386 — together with judgment for any amount shown to be due, including any fee subject to forfeiture or exceeding a lawful, agreed, and documented fee, with interest as permitted by law.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment:

(a) Ordering ZNC, Virgil, Prueher, and Flood to deliver forthwith to Plaintiff, in native form with metadata intact, all client-file materials in their possession, custody, or control from every matter in which ZNC represented Plaintiff as alleged herein, from all repositories, including the client-file materials residing in the personal email accounts used in the representation, in Flood's systems, and in any repository of Prueher's subsequent firms;

(b) Ordering ZNC and Virgil to serve a sworn certification identifying the custodians and repositories searched, the categories produced, whether the personal accounts known to have been used in the representation were searched, and whether any responsive materials were withheld or no longer exist, and if so, identifying them;

(c) Ordering ZNC and Virgil to render a full and documented accounting of the Silver Hill settlement funds, including trust-account and ledger records, all settlement instruments and

endorsements, and all fee and disbursement records, reconciling the $40,000 recited consideration, the figures recited in ZNC079386, and the $25,000 transmitted to Plaintiff, together with forfeiture and disgorgement of fees received for the disloyal representation as sought in Count III;

(d) Declaring the October 11, 2017 release voidable and rescinded as against Silver Hill and Danaher, or unenforceable as a bar to the claims alleged herein, pursuant to Count VI;

(e) Awarding Plaintiff, on Counts II, III, IV, VII, and VIII, the damages identified in each of those Counts — the deprivation, possession-and-use, out-of-pocket, recovery-cost, retained-fee, forfeiture, and post-notice prolongation losses there enumerated — in amounts to be determined at trial; and, on Counts V and VI, the restitutionary, restoration, offset, and rescission-related relief there identified; and, on Count XI, the accounting and any amount shown due thereon;

(f) Awarding Plaintiff threefold the damages he sustained on Counts IX and X, together with his costs of suit, pursuant to 18 U.S.C. § 1964(c);

(g) Awarding Plaintiff punitive damages on Counts II, III, IV, VII, and VIII;

(h) Appointing, pursuant to Federal Rule of Civil Procedure 53 and the Court's inherent authority, if the Court determines that ordinary discovery, sworn certifications, and less intrusive verification measures are insufficient, a neutral third-party forensic examiner — having no prior professional or business relationship with any party or counsel — to inventory and verify the repositories reasonably likely to contain Plaintiff's client-file materials, including relevant email systems, document-management systems, archives, personal accounts used in the representation, and former-employee repositories; to determine whether the identified custodians and sources were preserved, collected, searched, and produced; and to report to the Court concerning the completeness and integrity of the production, pursuant to a Court-approved protocol protecting

other clients' privileged, confidential, and unrelated information, with any imaging limited to relevant repositories, date ranges, custodians, and search protocols under Court supervision, and with costs allocated as the Court determines equitable;

(i) Awarding Plaintiff pre- and post-judgment interest, costs, and such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 21, 2026

Respectfully submitted,

s/ Ari B. Teman

Ari B. Teman

Plaintiff, pro se

1521 Alton Road, #888

Miami Beach, Florida 33139

ari@teman.com

781-718-3375